**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                      No. CR 11-2860 JB

KEITH MICHAEL COURTNEY,

     Defendant.

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>[1]

**THIS MATTER** comes before the Court on Defendant Courtney's Motion to Preserve Right to Jury Trial, filed March 29, 2012 (Doc. 31)("Motion").  The Court held a hearing on February 8, 2013.  The primary issues are: (i) whether the Court should permit Defendant Keith Michael Courtney to inform the jury of the United States Sentencing Guidelines' advisory sentencing provisions at his trial; and (ii) whether the Court should instruct the jury with information that implies existence of its power to nullify.  The Court will deny the motion.  The Supreme Court of the United States' recent decisions about the Sixth Amendment to the United States Constitution's right to a jury trial suggest that the Supreme Court is willing to reconsider precedent by addressing whether a particular practice is necessary to the jury trial right as it existed at the time that the States ratified the Sixth Amendment.  Historical sources and precedent show that the common-law jury at the Founders' time knew the ramifications of a guilty verdict and used that knowledge in reaching a verdict, frequently choosing a verdict because it would mitigate a

---

[1] This Amended Memorandum and Opinion Order replaces the Court's previous Memorandum Opinion and Order, filed April 23, 2012 (Doc. 115).  The Court is amending its previous opinion to address a typo on page 3 -- replacing "Court's" with "courts" -- and on page 67 -- changing "a reservation of power jury powers" to "a reservation of jury power."  This footnote and those two typographical changes are the only changes to the Memorandum Opinion and Order.

defendant's punishment.   Moreover, although courts at the Founders' time instructed the jury that the court's role is to provide the jury the law and that the jury's role is to apply that law to the facts as the jury finds them, the courts also instructed the jury that its role included ultimately deciding both the facts and the law.   Additionally, courts at the Founders' time allowed lawyers to argue openly to the jury that it should exercise its ability to decide the law in the case and nullify the law that the court gives.   Accordingly, the common-law jury in the Framers' era knew about and exercised its power to acquit when the government proved beyond a reasonable doubt that the defendant was guilty, or to mitigate the defendant's sentence regardless whether application of the law given by the court to the facts which the jury found provided otherwise.   The Court concludes that, Supreme Court and especially Tenth Circuit precedent allowing the jury to know about sentencing ramifications only if its participation in sentencing is required, and precedent preventing the jury from learning about its nullification right, are inconsistent with trial practices at the Founders' time, and that these practices have eroded the Sixth Amendment jury trial right as the Framers understood that right.   Nevertheless, because, as a district court, the Court must faithfully apply controlling Supreme Court and Tenth Circuit precedent, the Court will deny Courtney's motion to instruct the jury with information implying that it has the ability to depart from its duty to follow the Court's instructions on the law.

## **FACTUAL BACKGROUND**

Courtney was part owner of Black Diamond Construction Company, Veritas Mortgage Company, and Polaris Realty, and co-Defendant Jason Johns was a loan officer with Veritas Mortgage.   See Indictment ¶ 1-2, at 1, filed November 11, 2009 (Doc. 2).   The Indictment charges that Courtney and Johns, with intent to defraud, devised a scheme to defraud Aurora Loan

Services and Plaza Home Mortgage, and to obtain money, funds and other property from Aurora Loan and Plaza Home.  See Indictment ¶ 5, at 1-2.  The purpose of the scheme was to obtain loans from Aurora Loan and Plaza Home by inducing them to lend funds to straw buyers for the purchase of residential properties, and using those funds to pay off existing mortgages, construction loans, and fraudulently obtain a portion of the funds.  See Indictment ¶ 6, at 2.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Courtney and Johns for wire fraud and aiding and abetting, associated with transactions that involve complex financial instruments, transactions, records, and activity over the course of nearly one calendar year.    Courtney states that, upon information and belief, Plaintiff United States of America investigated this matter for approximately two years before presenting the case to the grand jury.   An eight-page Indictment was entered on November 9, 2011, charging Courtney and co-Defendant Jason Johns with three counts of wire fraud, in violation of 18 U.S.C. § 1343.  See Indictment at 1-7.  The United States seeks Courtney's forfeiture of any and all property derived from the proceeds of the scheme, which is alleged to have included the illegal transfer of over $1,500,000.00.  See Indictment at 6-7.

Courtney filed his Motion on March 29, 2012, "request[ing] this Court uphold Courtney's right to a jury trial and permit the jury to be informed of the Guideline advisory sentencing provisions at any trial in this matter."  Motion at 1.  Courtney argues that the Government "repeatedly works to keep the jury ignorant of the ramifications of its determination of guilt," which "ignores the deep historical roots of the jury and denigrates its sacred role as the last stalwart standing before tyranny."  Motion at 1-2.  Courtney asserts that "[s]uch a lack of candor" violates the Supreme Court's guidance that courts should uphold a defendant's right to a jury trial "as it

was at the time of the Framers." Motion at 2 (citing United States v. Booker, 543 U.S. 220 (2005); Blakely v. Washington, 542 U.S. 296 (2004); Jones v. United States, 526 U.S. 227 (1999)). Courtney contends that the Supreme Court's recent decisions in United States v. Booker, Blakely v. Washington, and Jones v. United States,

> ha[ve] altered the landscape of the Sixth Amendment's parameters . . . [which] the Government has relied upon in support of continued ignorance . . . . [and] has emphatically rejected the pretense at the heart of the practice of disallowing jurors to learn the consequences of their verdict; that the jury is to ignore its role as the conscience of the community and bulwark against tyranny.

Motion at 2. Courtney asserts that "[t]he true meaning" of the Sixth Amendment requires the jury to be informed of the penalties associated with any guilty verdict if "its sacred role within our justice system is to be properly preserved." Motion at 2.

When Courtney filed his Motion, he asserted that he expects the United States to rely on United States v. Parrish, 925 F.2d 1293 (10th Cir. 1991), abrogated on other grounds by United States v. Wacker, 72 F.3d 1453 (1995), and United States v. Greer, 620 F.2d 1383 (10th Cir. 1980), for the proposition that a jury can be informed of the possible penalties of a guilty verdict only if the jury is statutorily required to participate in the defendant's sentencing. See Motion at 2. Courtney contends that the holdings of these cases "were implicitly overturned," because, contrary to the current aversion to candor to the jury, the Framers openly acknowledged the jury's nullification role and "praised it as a vital component to the jury's role." Motion at 2-3. Courtney argues that the jury's sacred role in the common law, including its nullification role when faced with unjust application of laws, has been diminished in the twentieth century. See Motion at 3. He asserts that the Supreme Court in Sullivan v. Louisiana, 508 U.S. 275, 178 (1993), however, directed courts to preserve the jury trial as it existed at the Framers' time. See

- 4 -

Motion at 3.

Courtney cites to United States v. Booker, Blakely v. Washington, and Jones v. United States in support of his contention that the Supreme Court "solidified this understanding of the parameters of the Sixth Amendment."   Motion at 3-4. He asserts: "The Supreme Court's declarations of the parameters of the jury's role in these cases is premised upon an honest examination of the historical significance of the jury and the role the Framers foresaw it must continue to play if liberty were to be preserved."   Motion at 4 (citing Blakely v. Washington, 542 U.S. at 306).

Courtney argues that the Supreme Court emphasizes that the right to a common law jury trial is essential to liberty, is "fundamental to the American scheme of justice," and that "this right was no accidental inclusion in our Constitution."   Motion at 4 (quoting Sullivan v. Louisiana, 508 U.S. at 277).   He asserts that the Framers intended the Sixth Amendment right to jury trial to eliminate the danger of unfounded criminal charges, and to "ensure the[] [people's] control in the judiciary."   Motion at 4 (quoting Blakely v. Washington, 542 U.S. at 306).   He asserts that the Framers' "understanding of the jury's role relied upon nullification of overly harsh sentencing."   Motion at 5.   Relying upon the statement in United States v. Jones that "other liberties would remain secure only so long as this [jury acting as the bulwark of our civil liberties] remains sacred and inviolate, not only from attacks, . . . but also from all secret machinations which may sap and undermine it," Motion at 5 (quoting United States v. Jones, 526 U.S. at 246)(internal quotations and emphasis omitted), Courtney argues that withholding the possible penalties associated with a guilty verdict "is just such a 'secret machination' which will 'sap and undermine' the sacred role of the jury."   Motion at 5.   He asserts that, in light of the Framers' distrust of the government, they

would have considered withholding such information from the jury as an affront to our liberty. <u>See</u> Motion at 5-6.

Courtney argues that the Framers' words contemplate and praise an expanded jury role in criminal trials.  <u>See</u> Motion at 6.  He relies on Alexander Hamilton's and John Adams' statements that the jury necessarily determines both the law and the fact in a given case for his contention that withholding the possible sentences from the jury is unconstitutional, as it "serves no purpose but to prevent their true understanding of the essence of the case before them." Motion at 7 (quoting <u>Sparf v. United States</u>, 156 U.S. 51, 143, 147, 149 (1895)(Gray, J., dissenting)).  He asserts that, "[a]s the Framers saw it, 'nullification can and should serve an important function in the criminal process' because it uniquely 'permits the jury to bring to bear on the criminal process a sense of fairness and particularized justice.'"  Motion at 8 (quoting <u>United States v. Dougherty</u>, 473 F.2d 1113, 1143 (D.C. Cir. 1972)(Bazelon, J., concurring in part and dissenting in part)).

Courtney argues that, to perform its constitutional duty, the jury must know the possible sentences which the defendant faces upon conviction.  <u>See</u> Motion at 8.  Courtney contends that, "the common law jury, which became the basis for the Framers understanding of the Sixth Amendment, knew the consequences of its verdict and often adjusted a verdict accordingly." Motion at 8 (citing <u>Sparf v. United States</u>, 156 U.S. at 110-183 (Gray, J. dissenting); <u>United States v. Dougherty</u>, 473 F.2d at 1138-1144 (Bazelon, J., concurring in part and dissenting in part); <u>United States v. Polizzi</u>, 549 F. Supp. 2d 308, 402-450 (E.D.N.Y. 2008), <u>vacated and remanded sub nom.</u>, <u>United States v. Polouizzi</u>, 564 F.3d 142 (2d Cir. 2009);   <u>United States v. Datcher</u>, 830 F. Supp. 411, 411 (M.D. Tenn. 1993), <u>abrogated by</u> <u>United States v. Chesney</u>, 86 F.3d 567, 574

(6th Cir. 1995)).   Courtney asserts that to continue to deprive juries of the sentencing consequences of their verdicts deprives them of understanding of "the essence of the charges at issue in the matters they are asked to decide" and thus deprives defendants of their Sixth Amendment entitlement to "the full protection to be afforded by a jury trial."   Motion at 9.

Courtney contends: "The Framers Trusted the Jury, and So Must We."   Motion at 9.   He asserts that the current practice of withholding sentencing information from the jury "relies upon a simple proposition; that the jury cannot be trusted with information that might lead to nullification."   Motion at 9.   He argues that this fear of trusting a jury with information which might lead to nullifications has no place in criminal law, and "is a dangerous step towards [the] tyranny" that the Framers intended for juries to prevent.   Motion at 10.   Courtney asserts: "The Framers would have scoffed at the notion that the jury has no role in protecting the people from unjust sentencing as a result of conviction, and this Court is bound by the Supreme Court to follow the Framers above all else."   Motion at 10.

On April 10, 2012, the United States filed United States' Response to Defendant Courtney's Motion to Preserve Right to Jury Trial (Doc. 31).   See Doc. 34 ("Response").   The United States asserts that "[i]t is clear from the Defendant's motion that his purpose in having the jury informed of the applicable guideline sentence provision is to invite jury nullification, which he describes as an historically appropriate role for the jury."   Response at 2.   The United States rejects Courtney's contention that Jones v. United States, Blakely v. Washington, and United States v. Booker implicitly overturn case law that precludes juries from being informed of possible sentences.   See Response at 2.   The United States asserts that these cases stand for the proposition that "any facts that increase the maximum penalty for a crime must be charged in the

indictment, submitted to the jury and proved beyond a reasonable doubt." Response at 2. The United States contends that "these cases in no way addressed or approved overturning the general rule that juries are not to be informed of possible penalties." Response at 2. It supports its position by quoting the Supreme Court's statement in Shannon v. United States, 512 U.S. 573 (1994): "It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" Response at 2-3 (quoting Shannon v. United States, 512 U.S. at 579). The United States also relies on the United States Court of Appeals for the Tenth Circuit's decision in United States v. Parrish, in which it stated: "Unless a statute specifically requires jury participation in determining punishment, the jury shall not be informed of the possible penalties." Response at 3 (quoting United States v. Parrish, 925 F.2d at 1299)). The United States notes that, in both United States v. Parrish and United States v. Greer, the offenses for which the defendants were tried carried mandatory minimum penalties. See Response at 3. It contends that, because Courtney does not face a statutory mandatory minimum here, "there is even less reason to dispose with Tenth Circuit precedent." Response at 3. The United States argues that Courtney's repeated contention that the United States is foregoing candor to the jury by not informing it of defendants' possible sentences, "is, in fact, an open invitation to the jury to nullify, a course which has been disapproved by the Tenth Circuit." Response at 4 (citing United States v. Gonzales, 596 F.3d 1228, 1237 (10th Cir. 2010)("[W]e disapprove of the encouragement of jury nullification."); Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999); United States v. Rith, 164 F.3d 1323, 1338 (10th Cir. 1999)).

        The United States argues that, because calculating the amount of actual loss pursuant to the

United States Sentencing Guidelines will be determinative of the overall guideline range, and because there are various ways in which the United States Probation Office can arrive at a total actual loss figure under the Guidelines, it is almost impossible to provide the jury with information regarding the possible sentencing range accurate enough for the information to be useful to the jury.   See Response at 4-5.   It points out that, in addition to calculating the actual loss to reach the base offense level, sentencing the defendant also depends on determination of the role in the offense and other guideline factors that may present themselves.   See Response at 5.   Many of these factors, the United States asserts, are necessarily determined at trial, as the parties go to trial largely because of differences in these facts.   See Response at 5.   It states:

> The facts and law supporting application of the various sentencing guideline factors are considered by the Court after a finding of guilt, after a Pre-Sentence Report is prepared and reviewed by the parties, and often after briefing and argument by the parties. Therefore, even if there were a legal basis for the Defendant's request, which there is not, informing the jury accurately before or during trial about the applicable sentencing guidelines provisions attaching to any verdict of guilty is not possible.

Response at 5.   The United States thus asks the Court to deny Courtney's Motion and preclude him from referencing any punishment he may face upon conviction.   See Response at 6.

At the February 8, 2013, hearing on the Motion, the Court noted that it believes that Tenth Circuit case law requires it to deny Courtney's Motion, but, to allow Courtney to preserve the issue for an eventual appeal to the Tenth Circuit or beyond, the Court will hear the parties' arguments and draft a Memorandum Opinion and Order which might provide a record for the appeal.   See Transcript of Hearing at 3:4-15 (Court)(taken Feb. 4, 2012)("Tr.").[2]   The Court inquired of

---

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcripts may contain slightly different page and/or line numbers

Courtney whether he had found any additional historical support for his argument that the right to trial by jury at the time of the Sixth Amendment's adoption included the right to present the jury with facts regarding sentencing or reference jury nullification.   See Tr. at 4:11-21 (Court, Linnenburger).   Courtney responded that he has, and informed the Court that he has a proposed jury instruction instructing the jury that, while they are the finders of fact and are required to then apply the law as the judge gives it to them, they do not have to apply the law if it would violate the jurors' conscience to do so.   See Tr. at 5:12-22 (Linnenburger).   The Court asked whether Courtney is seeking the Court's decision regarding two distinct issues: first, whether the colonies allowed jury nullification; and second, whether the jury at the Framers' time was informed of the possible penalties at trial.   See Tr. at 6:12-20 (Court).   Courtney agreed that, although he believes the two issues are interrelated, he is seeking the Court to decide both issues.   See Tr. at 6:21-7:2 (Linnenburger).

Courtney asserted that jury nullification was prevalent at the time of the Bill of Rights' adoption and that this reality can be seen by looking at how important it was to the Framers to be allowed the right to a jury trial of their peers, as that was one of the principal complaints which the Framers had with England's governing the colonies before the Revolutionary War.   See Tr. at 7:12-17 (Linnenburger).   He stated that juries, during England's rule of the colonies, would often employ jury nullification as a means of protesting acts of parliament, application of which the colonists felt was unjust.   See Tr. at 7:17-8:10 (Linnenburger).

The Court asked Courtney whether he agreed that, in both United States v. Booker and Blakely v. Washington, the Honorable Antonin Scalia, United States Supreme Court Justice, drew

a distinction between the jury's role in determining the factual issues and the Court's role in sentencing, determining that, historically, sentencing was the court's sole province.   See Tr. at 8:11-9:3 (Court).   Courtney conceded that the Court was correct, but asserted that, because sentencing at the time of the Bill of Rights' adoption was significantly less complex, and most cases were capital cases, the jurors knew the sentences the defendant faced during the trial.   See Tr. at 9:4-10:10 (Linnenburger, Court).   Courtney contended that, because sentencing has become so much more complex, and the array of offenses for which defendants are convicted has also grown in complexity, the jurors no longer know about the sentence that the defendant faces.   At the time of the Founders, this knowledge was -- and he contends still is -- an essential element of each case.   See Tr. at 10:10-11:2 (Linnenburger).   The Court asked whether it was necessary for jury nullification to give the jury the Guidelines range for the particular crime, or whether informing the jury of the sentence is distinct from jury nullification.   See Tr. at 11:3-9 (Court).   Courtney responded that the issues are intertwined, because he does not believe the courts prohibit telling juries about the possibility of jury nullification.   See Tr. at 11:10-12 (Linnenburger).   The Court asked if the proposition that courts allow juries to be informed about jury nullification is true, given that the Court consistently uses a preliminary jury instruction in which the Court tells the jury members they "have to disregard [] their notions about what the law should be; their job is to faithfully apply" the law as the Court gives it to them, and then in voir dire attempts to ensure each jury member can adhere to the instructions.   Tr. at 11:13-20 (Court).   Courtney responded that, while the courts might not specifically inform juries of their ability to exercise their power of nullification, juries still have the power to find all elements of a crime beyond a reasonable doubt, and return a verdict of not guilty, which courts cannot then easily review or overturn.   See Tr. at

12:1-10 (Linnenburger).   Courtney asserted that he believes it is the courts' duty, and part of the constitutional guarantee to a jury trial, to provide the jurors with the information they need to exercise that power, information that they would have known at the time of the Bill of Rights' ratification, including information about the sentence that the defendant faces if convicted.   See Tr. at 12:10-18 (Linnenburger).

The Court asked whether providing the jury with information about the possible sentence would cause juries to question why they are being provided the information, and to subtly suggest that perhaps the person should not face such a sentence and implicitly encourage jury nullification. See Tr. at 13:3-10 (Court).   Courtney responded that he does not know whether it would encourage nullification, but if it did encourage nullification, that would be consistent with the Founders' purpose in providing the jury trial guarantee.   See Tr. at 13:17-9 (Linnenburger).   The Court asked if a jury system without nullification is less democratic than a jury system with nullification, because a jury allows lay persons to take the facts as they find them and apply them to the laws the court gives them.   See Tr. at 14:10-17 (Court).   Courtney agreed that the jury is democratic in allowing a person's peers to find the facts and apply the law, but, because the jury is not provided all of the information about a case, such as potential sentences the accused faces if convicted, it is less democratic now than it was at the time of the Bill of Rights' ratification.   See Tr. at 14:18-15:20 (Linnenburger).   Courtney asserted that, although he believes Sixth Amendment jurisprudence will eventually allow defendants to argue jury nullification to juries as he contends they were able to do at the time of the Sixth Amendment's adoption, he is asking only to provide the jury "the necessary information in order to effectively play the role of the community's conscience . . . ."   Tr. at 15:21-16:3 (Linnenburger).   Courtney asserted that, when

- 12 -

the courts tell jurors to follow the law as it is told to them, and to set aside their notions about what the law should be, the courts are asking the jurors to disregard their conscience.  See Tr. at 17:12-18:1 (Linnenburger).  Courtney asserted that the "crux" of their argument is that, if juries do not have the information about, and knowledge of, their role as the community's conscience, regardless of the law which legislators make and which judges interpret, then the government has taken away their constitutional role.  See Tr. at 19:10-15 (Linnenburger).

The Court asked whether Courtney had any material supporting his position other than what is in his brief, and he replied that he had found a transcript from a trial in 1730, in which Andrew Hamilton argued to the jury that it was its ultimate duty to act consistent with its conscience in returning the verdict, regardless what the court told them was the law.  See Tr. at 19:21-20:22 (Court, Linnenburger).  Courtney also referred the Court to a case in front of the Supreme Court from 1794, in which, although a civil case, the Supreme Court noted that the facts were determined and that all that was left was for the jury to determine the law.  See Tr. at 20:23-21:12 (Linnenburger).  The Court asked whether Courtney has found any materials on informing the jury of the ramifications of a guilty verdict, to which Courtney responded that he has not found any such information.  See Tr. at 24:16-19 (Court, Linnenburger).  He asserted, however, that he believed the lack of historical precedent for the issue "is because it was not necessarily an issue that would need to be discussed until sentencing became as complex as it is today."  Tr. at 24:19-22 (Linnenburger).

The Court asked whether Courtney contends that it is exclusively the prosecutors in precedent that want to exclude sentencing information from going to the jury, or whether, as it appears from case law, that the defense bar also wishes to keep information about possible

penalties away from the jury, so that it decides only the issue of guilt, rather than if and for how long someone should be punished, guilty or not.  <u>See</u> Tr. at 25:18-26:18 (Court).  Courtney responded that he attempts to address that issue in the proposed jury instruction that he will submit, because it states that, before looking at whether the laws or sentencing is conscionable, the jury must determine whether the government has proved its case beyond a reasonable doubt.  <u>See</u> Tr. at 27:9-16 (Linnenburger).  The Court asked Courtney whether the government would, in a case of its choosing, have the same option to inform the jury of its role, or whether Courtney believed the ability to inform the jury of sentencing should be a "one-way street," pointing out that there may be instances in which a jury would opt for an offense with a sentence it thought more appropriate as punishment, regardless whether the government proved the elements necessary for that offense.  Tr. at 28:6-25 (Court).  Courtney asserted that it depends on how the sentencing information is presented, but that the jury has rights of its own, including access to knowledge about its nullification power and potential repercussions of its verdict.  <u>See</u> Tr. at 29:1-10 (Linnenburger).  He added that he is

> under no false pretense that we would ever be able to argue for nullification or . . . openly argue you can't convict this guy because if you do . . . he's going to do 15 years or something along those lines.  We're simply asking that included in the instructions . . . what the sentence may be.

Tr. at 29:11-19 (Linnenburger).  He conceded that the defendant's right to a fair trial would ultimately carry the day over allowing the government to argue for a harsher penalty than that of the offense which it can reasonably prove: "[T]he Bill of Rights has always been . . . both a set of affirmative rights for us as individual and negative rights to prevent the government from over stepping [its] bounds . . . ."  Tr. at 29:19-30:12 (Linnenburger, Court).

    The United States agreed with Courtney that "there's no question that the right to jury trial

that's embodied in the Sixth Amendment was of overwhelming importance to the [Framers] in the late 1700's and that they were certainly thinking in terms of their current events and who their jurors were . . . ."  Tr. at 32:12-17 (Higgins).   The United States asserted that the Honorable Jack Bertrand Weinstein, Senior United States District Judge, in United States v. Polizzi started down the road to determine whether juries should be informed of the possible repercussions of their guilty verdict, likely because he "was appalled at a minimum mandatory sentence in a child pornography case for an 18 year old college student who had no priors."  Tr. at 32:17-22 (Higgins).   The United States noted that Judge Weinstein came to the conclusion that

> jurors in those tim[es] knew what the law was, knew what the penalties were because there were fewer laws and the penalties were much easier to understand. And the assumption was that property[-owning] [] men would be well informed about these things, and so there would be no need for judges to inform them. . . . [J]udge [Weinstein]'s view of history and all of his citations to various [sources] would lead to the conclusion, that in Colonial times they knew, they were expected to know [of possible sentences], and because of that could nullify either by acquitting a guilty defendant or by finding lesser include[d offenses].

Tr. at 33:9-22 (Higgins).   The United States contrasted Judge Weinstein's conclusion in United States v. Polizzi with United States v. Luisi, 568 F. Supp. 2d 106 (D. Mass. 2008), in which the Honorable William G. Young, United States District Judge, although he also concluded that jurors at the time of the founders knew about the repercussions of their verdict, declined to inform the jury about sentencing because he was worried about the jury's nullification diminishing the role of juries.  See Tr. at 34:4-13 (Higgins).   In response to the Court's inquiry how informing the jury of its nullification power would diminish its role, the United States responded that it believed that Judge Young was worried about jury nullification destroying any predictability which there may be in jury verdicts, and thus destroy how criminal courts and parties function in their day-to-day business.  See Tr. at 34:24-35:18 (Higgins).

- 15 -

The United States asserted that it disagrees, however, with Courtney's contention that recent Supreme Court precedent makes likely that it will move in the direction of allowing the juries to be informed either of possible sentences or about its nullification power.  See Tr. at 35:19-22 (Higgins).  The United States argued that the Supreme Court cases Courtney cites to support his position are unrelated to the issues of jury nullification or informing juries of sentencing possibilities.  It stated that "Blakely and Booker and their progeny . . . are, in fact, upholding jurisprudence of over a hundred years that finds the fact finding role of the jury to be of paramount importance."  Tr. at 35:25-36:11 (Higgins).   The United States asserted:

> One of the things underlying the change in the 1800's from jurors knowing about the laws and the penalties was that the United States underwent a revolution, we became a much more commercial enterprise.  And that's talked about in both the [Luisi] case and the [Polizzi] case.  But because of that it became more important for there to be some certainty for litigants in court cases . . . . To allow juries to vote their conscience is not going to give that kind of certainty to litigants.  And if it's important in a civil context it's equally or more important in a criminal case.

Tr. at 36:24-37:10 (Higgins).   The United States added:

> Speaking from [] experience, I know that juries do not have to be informed about their power to nullify, to disregard the facts and to decide as they wish, but I think that opening the door to that by telling them about their power to do that and [] informing them about the sentences that are possible will open a Pandora's box that ultimately is not going to be good for the judiciary or for the jury system as a whole.

Tr. at 38:17-24 (Higgins).  The United States stated that, in regard to Courtney's case, he is indicted for wire fraud, for which there are no mandatory minimum sentences, and that, because of the fact-intensive determinations under the sentencing guidelines for wire fraud, it does not therefore know how to inform the jury of the repercussions of a guilty verdict before the calculations are performed after trial.  See Tr. at 39:1-12 (Higgins).

Courtney responded: "I don't think we're operating under any assumption that it would be

- 16 -

easy to do this.   And I think everybody recognizes that it may create some messiness; however, I don't think that is a reason" to deny a constitutional right.   Tr. at 41:20-42:1 (Linnenburger). The Court asked him whether the United States was correct in its assertion that Courtney is not asking the Court to let him inform the jury of its nullification power, but rather to inform the jury of the ramifications of a guilty verdict.   See Tr. at 42:4-10 (Court).   Courtney responded that the United States is correct and that, although he believes the Supreme Court will one day allow defendants to inform juries of their nullification power, he is "simply asking that the jury be given the information necessary to do so if they choose on their own."   Tr. at 42:11-16 (Linnenburger). In response to the Court's inquiry whether he had filed his proposed jury instruction, Courtney responded that he had not, but that he would do so.   See Tr. at 42:22-43:6 (Court, Linnenburger).

Courtney asserted that there is precedent for informing the jury of the ramifications of a guilty verdict, as courts inform potential jurors early on in a federal death penalty case that the case carries a possible death sentence, and must qualify all the jurors as being able to consciously come to a guilty verdict in the face of such a ramification.   See Tr. at 45:15-46:9 (Blackburn).   The United States responded by pointing out that the reason the potential jurors are informed of the possibility of a guilty verdict resulting in the defendant's death sentence is to disqualify jurors who would therefore not return a guilty verdict, or, in other words, nullify the verdict notwithstanding that the government has proved its case. See Tr. at 48:24-49:4 (Higgins).   The United States asserted that the death penalty cases support the proposition that jury nullification should be avoided, and that the Court should not encourage it by allowing potential jurors to know the ramifications of a guilty verdict, or their ability to nullify, except in the exceptional case of death penalties, where too many potential jurors will consciously nullify the verdict.   See Tr. at 49:5-10

- 17 -

(Higgins).

After the hearing, Courtney filed Defendant Courtney's Proposed Jury Instruction Relating to Motion to Preserve Right to Jury Trial (Doc. 31), on February 8, 2013.  See Doc. 52 ("Courtney's Proposed Instruction").   In this document, Courtney submits his proposed instruction.   Although the Motion focuses largely upon providing the jury information about the possible sentencing ramifications of their return of a guilty verdict, Courtney's proposed instruction focuses almost wholly on the jury nullification argument, as it modifies the Tenth Circuit Pattern Instruction (Criminal) § 1.04, which instructs the jury about its duty to follow the court's instructions as to the case's law.   Compare Courtney's Proposed Instruction at 1-2 with Tenth Circuit Pattern Instruction (Criminal) § 1.04.   Courtney specifically proposes to modify the Tenth Circuit Pattern Instructions (Criminal) § 1.04, by striking the text and adding the bracketed text as follows:

> You, as jurors, are the judges of the facts.  But in determining what actually happened -- that is, in reaching your decision as to the facts -- it is your sworn duty  to follow all of the rules of law as I explain them to you [**unless you are left with a firm belief that application of those rules in this case would be fundamentally unjust**].
>
> ~~You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However,~~ [Y]ou should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.
>
> It is also your duty to base your verdict ~~solely upon the evidence~~, without prejudice ~~or sympathy~~. That was the promise you made and the oath you took.
>
> [**If you determine the facts do not prove guilt beyond a reasonable doubt, you must enter a verdict of not guilty. If you determine the facts do prove guilt beyond a reasonable doubt, you should enter a verdict of guilty**

- 18 -

**unless you have a firm belief that a conviction would be fundamentally unjust.**]

Courtney's Proposed Instruction at 2 (modifying Tenth Circuit Pattern Instructions (Criminal) § 1.04).

## LAW RELATING TO JURY NULLIFICATION

The Sixth Amendment guarantees to a criminal defendant the right to "an impartial jury." U.S. Const. amend. VI. "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.   Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. at 305-06.   The jury trial right as preserved in the Bill of Rights was passed down from the right as enshrined in the Magna Carta.   See United States v. Booker, 543 U.S. at 239 ("The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta.").

### 1.      **The Jury's Role at the Founders' Time.**

"The colonial jury played a vital and celebrated role in American resistance to British tyranny leading up to the revolution.   American counsel regularly argued the validity of laws directly to juries, which often refused to enforce British laws they felt were unjust."   Andrew J. Parmeter, Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification, 46 Washburn L.J. 379, 382-83 (2007)(internal footnotes omitted).   Judge Weinstein noted that, in 1791, at the time of the Sixth Amendment's ratification, "[i]t was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt.   In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to 'nullify.'"   United States v. Polizzi, 549 F. Supp. 2d at 405.

The Supreme Court has recognized that the jury trial right that the Sixth Amendment affords to defendants was understood at the Founders' time to provide essential protections against government tyranny and safeguards liberty:

> [T]he historical foundation for our recognition of these principles extends down centuries into the common law.  "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ." 4 [Sir William Blackstone, Commentaries on the Laws of England: In Four Books 343 (William D. Lewis ed., 2007)] (1769) . . . .

Apprendi v. New Jersey, 530 U.S. 466, 477 (2000).   As Hamilton first noted, this belief in the jury trial right as a safeguard to liberty was widely agreed upon during the constitution-framing era:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury.  Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

The Federalist No. 83, at 456 (Scott ed. 1894)(Hamilton).   The jury trial right was part and parcel of the Framers' belief that the common person should participate in government, and essential to this participation was ensuring that the judiciary was justly and correctly effectuating the laws, whether the laws were written or natural laws.  See Clay S. Conrad, Jury Nullification 45 (1998)(citing Note, The Changing Role of the Jury in the Nineteenth Century, 74 Yale L. J. 170, 172 (1964)).  See Diary of John Adams, Feb. 12, 1771, in 2 The Works of John Adams 253 (1850) (quoted in Blakely v. Washington, 542 U.S. at 306 ("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature [as in the legislature.]")); Letter from Jefferson to L'Abbe Arnold, July 19, 1789, in 3 Works of Thomas Jefferson, 81, 82 (1854)

(quoted in Mark D. Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 582 (1939))("Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative.   The execution of laws is more important than the making of them.").

The criminal jury's role at the Founders' time was primarily that of a factfinder, but also included as a secondary role acting as the community's conscience to determine whether the law, or the application of law to the facts, was conscionable.   Professor Irwin A. Horowitz notes: "While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not."   Irwin A. Horowitz, Jury Nullification: An Empirical Perspective, 28 N. Ill. U. L. Rev. 425, 427 (2007-2008).   Similarly, Clay S. Conrad asserts that the Sixth Amendment jury trial right implicitly recognizes criminal juries' right to determine the law -- and thus jury nullification if they believe the law wrong -- because, at the Framers' time, the concept of a jury included the idea that the jury not only decided the facts of a case, but also the law:

> The Sixth Amendment itself implicitly recognizes the right of criminal trial jurors to judge the law.   Although it does not mention that power explicitly, it can logically be assumed that the definition of a jury used in that document would be consonant with the prevailing definition in the legal dictionaries of the period.   The most common legal dictionary in Colonial Virginia was the British Jacob's Law Dictionary [(1782)]; and within the encyclopedic definition given in Jacob's, the word 'jury' is defined as:
>
> > Jury . . . Signifies a certain number of men sworn to inquire and try the matter of fact, and declare the truth upon such evidence as shall be delivered them in a cause: and they are sworn judges upon evidence in matter of fact . . . .   Juries are . . . not finable [sic] for giving their verdict contrary to the evidence, or against the direction of the court; for the law supposes the jury may have some other

- 21 -

> evidence than what is given in court, and they may not only find things of their own knowledge, but they go according to their consciences. . . .
>
> The right of jurors to judge "according to conscience," then, was implicit within the word "jury" as the drafters of the Bill of Rights understood it.   This was the trial by jury the founders knew, and this was the trial by jury they intended to pass on to their progeny.

C. Conrad, supra, at 46-47 (internal footnotes omitted).   The assertion that criminal juries embraced decisions of law as well as fact finds support in precedent case law from the Founders' era.

In Georgia v. Brailsford, 3 U.S. (3 Dall.) 1 (1794), although a civil case, the Supreme Court noted that the role of the jury is to be the ultimate finder both of the facts and of the law.   See 3 U.S. at 4.   Because the State of Georgia was a party to the case, the Supreme Court had original jurisdiction, but a jury nevertheless decided the case. Chief Justice John Day charged the jury:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide.   But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.   On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are lawfully, within your power of decision.

Georgia v. Brailsford, 3 U.S. at 4.   A case from the Founders' era in which the jury's role as limited to the factfinder. or as embracing the role of determining the law, is front and center in People v. Croswell, 3 Johns. Cas. 337 (N.Y. Sup. Ct. 1804), in which Hamilton was counsel for the defendant, indicted for libel against then-President Thomas Jefferson.   The trial court in the case instructed the jury that they were to enter a special, as opposed to general, verdict limited to

finding only two issues: (i) whether the article was published; and (ii) whether the article's innuendos were true or false.   See 3 Johns. Cas. at 342.   The jury was instructed that the defendant's intent -- the element requiring that the defendant intended the statements to libelous -- was a matter of law exclusively for the court.   See 3 Johns. Cas. at 341-42.   Hamilton argued:

> The Chief Justice misdirected the jury, in saying they had no right to judge of the intent and of the law. In criminal cases, the defendant does not spread upon the record the merits of the defence, but consolidates the whole in the plea of not guilty. This plea embraces the whole matter of law and fact involved in the charge, and the jury have an undoubted right to give a general verdict, which decides both the law and the fact. . . .   All the cases agree that the jury have the power to decide the law as well as the fact; and if the law gives them the power, it gives them the right also. Power and right are convertible terms, when the law authorizes the doing of an act which shall be final, and for the doing of which the agent is not responsible.
>
> The intent constitutes crime. To deny, then, to the jury the right to judge of the intent, and yet to require them to find a general verdict of guilty, is requiring them to commit perjury. The particular intent constitutes the crime, in cases of libel, beca[us]e the act is not, of itself, unlawful; and where the particular intent alone constitutes the guilt, the court cannot judge of that intent, and the jury must find it. . . .
>
> It is admitted to be the duty of the court to direct the jury as to the law, and it is advisable for the jury in most cases, to receive the law from the court; and in all cases, they ought to pay respectful attention to the opinion of the court.   But, it is also their duty to exercise their judgments upon the law, as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions.   It is essential to the security of personal rights and public liberty, that the jury should have and exercise the power to judge both of the law and of the criminal intent.

People v. Croswell, 2 Johns. Cas. at 345-46 (emphasis omitted).   The prosecution countered that the sound administration of court business requires that juries be permitted to determine the facts only:

> The jury have, undoubtedly, the power, in criminal cases, to decide the law as well as the fact, if they will take upon themselves the exercise of it; but we must

distinguish, in this case, between power and right.   It is the right of the jury to decide the fact, and only the fact; and it is the exclusive province of the court to decide the law in all cases, criminal as well as civil.   A jury is wholly incompetent, and necessarily must be, from the nature of their institution, to decide questions of law; and if they were invested with this right, it would be attended with mischievous and fatal effects.   The law, instead of being a fixed rule, would become uncertain and capricious, and there would not remain any stability or uniformity of decision, or certainty of principle, in the administration of justice. . . .

If the jury were to judge of the law in the case of libels, why not of the effect of writings in civil cases, and of the law in all cases where the plea is the general issue?   Surely the counsel on the other side are not prepared to carry their doctrine to this extent.

3 Johns. Cas. 350-51.   Hamilton replied:

But it is not only the province of the jury, in all criminal cases, to judge of the intent with which the act was done, as being parcel of the fact; they are also authorized to judge of the law as connected with the fact.   In civil cases, the court are the exclusive judges of the law, and this arose from the nature of pleadings in civil suits; for, anciently, matters of law arising in the defence, were required to be spread upon the record, by a special plea, and the jury were liable to an attaint for finding a verdict contrary to law.   But in criminal cases, the law and fact are necessarily blended by the general issue, and a general verdict was always final and conclusive, both upon the law and the fact.   Nor were the jury ever exposed to an attaint for a verdict in a criminal case; and this is decisive to prove that they had a concurrent jurisdiction with the court on questions of law; for where the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it. This is a sure and infallible test of a legal power.

In England, trial by jury has always been cherished, as the great security of the subject against the oppression of government; but it never could have been a solid refuge and security, unless the jury had the right to judge of the intent and the law.

The jury ought, undoubtedly, to pay every respectful regard to the opinion of the court; but suppose a trial in a capital case, and the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts, (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions?   To oblige them, in such a case, to follow implicitly the direction of the court, is to make them commit perjury, and homicide, under the forms of law.   Their error is fatal and cannot be

corrected. The victim is sacrificed; he is executed; he perishes without redress. Was he a juror, in such a case, he would endure the rack rather than surrender his own convictions on the altar of power, rather than obey the judicial mandate.

People v. Croswell, 3 Johns. Cas. at 355-56 (internal citations omitted).

The Supreme Court of New York was equally split, with two justices agreeing with Hamilton and two justices siding with the prosecution.   Justice James Kent wrote in agreement with Hamilton, that "[t]here is nothing peculiar in the law of libels, to withdraw it from the jurisdiction of the jury" by requiring a special verdict.  3 Johns. Cas. at 365-66.  He reasoned that, in all other areas of criminal law, the jury is charged with finding intent:

The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it traitorously; and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with malice prepense, or took the property feloniously. So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it seditiously.   In all these cases, from the nature of the issue, the jury are to try not only the fact, but the crime, and in doing so, they must judge of the intent, in order to determine whether the charge be true, as set forth in the indictment.   The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

3 Johns. Cas. at 366-67 (emphasis omitted).   He thus concluded:

[U]pon every indictment or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the innuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of "the whole matter put in issue upon such indictment or information."   That in this, as in other criminal cases, it is the duty of the court, "according to their discretion, to give their opinion and direction to the jury on the matter in issue;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

3 Johns. Cas. at 376-77 (internal citation omitted).

Chief Justice Morgan Lewis disagreed with Hamilton and Justice Kent, and concluded that

the policies behind not constricting a jury to deciding matters of law are not present in the United

States as they were in England:

> It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government.   But how, has not been attempted to be shown.   In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct.

People v. Croswell, 3 Johns. Cas. at 409.

### 2.    *Sparf v. United States*, 156 U.S. 51 (1895).

In the nineteenth century, Justice Joseph Story, riding circuit in Massachusetts, is credited

with issuing the first American opinion explicitly limiting the role of jurors in United States v.

Battiste, 24 F. Cas. 1042 (C. C. D. Mass. 1835).   See C. Conrad, supra, at 65 (noting that 160

years had passed since the introduction of jury nullification, or jurors as deciders of the law,

"before Supreme Court Justice Joseph Story, riding circuit in Massachusetts, rendered the first

major American court opinion limiting the role of juries . . ."); United States v. Polouizzi, 687 F.

Supp. 2d 133, 190 (E.D.N.Y. 2010), vacated, 393 F. App'x 784 (2d Cir.

2010)(unpublished)(noting that the first of "[t]wo major Supreme Court Justices' opinions in the

nineteenth century . . . restricting the Sixth Amendment's jury" right to decide the law is "Justice

Story's in . . . United States v. Battiste . . .").   In United States v. Battiste, the defendant was on

trial for violation of a newly enacted law punishing human trafficking in slaves, and Justice Story

was concerned that, because Massachusetts was the first state to abolish slavery and was home to

much of the abolitionist movement, the jury would convict him based on their beliefs about slavery

rather than on the facts.   See C. Conrad, supra, at 66; United States v. Polouizzi, 687 F. Supp. 2d

at 190-91 ("Justice Story's statement was made in the context of <u>preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty</u>." (emphasis in original)).   Justice Story instructed the jury as to his opinion that the jury determining guilt based on the jurors' own beliefs, rather than on the law as the court told them -- jury nullification -- is inconsistent with the notion of a fair trial:

> Before I proceed to the merits of this case, I wish to say a few words upon a point, suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life.  It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact.   My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue.   In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact.   In each, they have the physical power to disregard the law, as laid down to them by the court.   But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure.   On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law.   It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court.   This is the right of every citizen; and it is his only protection.   If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury.   Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was.   On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require.   Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it.   If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial.   But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an

- 27 -

> intelligent jury can understand the principles of law applicable to the subject, as
> well as the court; for they are the principles of common sense.   And as little reason
> is there, in my view, to suppose, that they can operate injuriously to the real merits
> of the case of the prisoner.

24 F. Cas. at 1043.   In <u>Pierce v. State</u>, 13 N.H. 536 (1843), the Supreme Court of New Hampshire

cited to <u>United States v. Battiste</u> in holding that the right to return a verdict based on a finding that

the law is otherwise than the court gives it to the jury is inconsistent with the proposition that the

Constitution is the supreme law of the land:

> [T]he result at which we have arrived is that the juries have not the right to decide
> the law in any case; that this accords with the best authorities in the common law,
> and with other legal rights which must be surrendered if they may decide the law;
> and that they are bound by the law, as laid down to them by the court. . . .
>
> The constitution of the United States, and the acts of Congress made in
> pursuance thereof, are the supreme law of the land, and the judges in every state are
> bound thereby.  If juries are not bound also, the question can never be settled
> whether a law be in pursuance of the constitution, and the courts must suspend their
> judgments until a sufficient number of verdicts has been returned, one way or the
> other, to render it probable that juries generally in future will return their verdicts
> the same way, -- for no nearer approach to certainty could be made.
>
> We cannot believe that impartial and reflecting men, of whatever profession
> they may be, can advocate doctrines which may lead to such results as the right of
> the jury to decide the law may end in.  We cannot think that the people or their
> representatives would be content with an exposition of the constitution which
> would cause the constitutionality of the license law to remain an open question,
> until it could be settled by the verdict of a jury; of a body admirably adapted to the
> decision of questions of fact, but irresponsible, giving no reasons for their
> decisions, not subject to impeachment or attaint, without access to the sources of
> the law, and therefore unfitted for the investigation of legal rights.  No reflecting
> man in the jury box would be willing to take upon himself this responsibility.  He
> would feel that the question could not be examined with the deliberation it required;
> that the law could not be expounded with quite so much facility as it could be made,
> -- and that there was no such inspiration in the jury box as would enable twelve men
> to determine, per saltum, grave questions which, elsewhere, require care, and
> thought, and patient study, and time for undisturbed reflection.  And it is the
> opinion of the court, that it is inconsistent with the spirit of the constitution that
> questions of law, and still less, questions of constitutional law, should be decided
> by the verdict of the jury, contrary to the instructions of the court.

13 N.H. at 551-54 (internal citations omitted).   Courts around the country began to follow suit and adhere to the proposition that allowing juries to decide the law in a case, and to decide against the law as the court gave it to them, is inconsistent with the constitutional right for a fair trial.   See e.g., Commonwealth v. Porter, 51 Mass. 263, 263 (Mass. Supr. Ct. 1845)("[I]t is the duty of the court to give instructions to the jury on all questions of law which arise in a cause tried by them; and it is the duty of the jury to receive the law from the court, and to conform their . . . decision to such instructions . . . ."); State v. Burpee, 65 Vt. 1, 25 A. 964, 973 (1892)("The doctrine that jurors are judges of the law in criminal cases is repugnant to . . .the constitution of Vermont, which guaranty to every person within this state 'a certain remedy' for all wrongs, conformably to the laws . . . .").

Sixty years after United States v. Battiste, Justice John Marshall Harlan, writing for the majority in Sparf v. United States, was tasked with deciding whether the district court could find that manslaughter did not apply as a matter of law, and the jury had to follow that instruction, or whether it was wholly the jury's determination.   The defendants in Sparf v. United States, tried jointly for murder, asserted on appeal that the court invaded the jury's province to determine the law and the facts in criminal cases, where the judge instructed the jury on manslaughter and murder, but also instructed the jury:

> I do not consider it necessary, gentlemen, to explain [manslaughter] further, for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder.   In other words, it may be in the power of the jury, under the indictment by which these defendants are accused and tried, of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; yet, as I have said in this case, if a felonious homicide has been committed at all, of which I repeat you are the judges, there is nothing to reduce it below the grade of murder.'

156 U.S. at 60.   The judge additionally instructed them: "[A]s one of the tribunals of the country,

a jury is expected to be governed by law, and the law it should receive from the court."   156 U.S.

at 63.   The Supreme Court held that the district court did not err in giving these instructions:

> We are of opinion that the court below did not err in saying to the jury that
> they could not, consistently with the law arising from the evidence, find the
> defendants guilty of manslaughter, or of any offense less than the one charged; that
> if the defendants were not guilty of the offense charged, the duty of the jury was to
> return a verdict of not guilty.   No instruction was given that questioned the right of
> the jury to determine whether the witnesses were to be believed or not, nor whether
> the defendant was guilty or not guilty of the offense charged.   On the contrary, the
> court was careful to say that the jury were the exclusive judges of the facts, and that
> they were to determine -- applying to the facts the principles of law announced by
> the court -- whether the evidence established the guilt or innocence of the
> defendants of the charge set out in the indictment.
>
> The trial was thus conducted upon the theory that it was the duty of the court
> to expound the law, and that of the jury to apply the law as thus declared to the facts
> as ascertained by them.   In this separation of the functions of court and jury is
> found the chief value, as well as safety, of the jury system.   Those functions cannot
> be confounded or disregarded without endangering the stability of public justice, as
> well as the security of private and personal rights.

156 U.S. at 106.

Justice Harlan notes the varied opinions of jurists and court decisions dating back to

Georgia v. Braislford which had recognized that juries necessarily have the right to determine

matters of law in addition to fact, but concludes: "We are of the opinion that the law in England at

the date of our separation from that country . . . falls far short of the contention that the jury, in

applying the law to the facts, may rightfully refuse to act upon the principles of law announced by

the court."   Sparf v. United States 156 U.S. at 90.   Justice Harlan reasoned that the incorrect

belief about the jury's ability to depart from the law which the court gives to it arises from the

jury's ultimate ability to decide guilt or innocence in rendering a general verdict: "The contrary

view rests, as we think, in large part, upon expressions of certain judges and writers, enforcing the

principle that when the question is compounded of law and fact a general verdict, ex necessitate, disposes of the case in hand, both as to law and fact." 156 U.S. at 90. He determined, therefore, that, "the general common-law rule in criminal cases" at the time of the Sixth Amendment's ratification was:

> the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98. Justice Harlan thus rejected the defendants' contention that the district court judge's instructing the jury that it was to follow the law that he gave to them was improper, reasoning:

> We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be.

Sparf v. United States, 156 U.S. at 102. Justice Harlan, articulating the policy behind the Supreme Court's holding, noted that requiring juries to adhere to courts' instructions ensures that laws, even if they may be unpopular, are enforced:

> "As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice. But, on the other hand, I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne."

- 31 -

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt. 62, 63 (C.C.D. Mass. 1851)).

States quickly followed on the heels of the Supreme Court's decision in Sparf v. United States to restrict the role of juries.  Pennsylvania, for instance, clarified its opposition to jury nullification in the case of Commonwealth v. Bryson, 276 Pa. 566, 120 A. 552 (1923), where the defendant challenged the district court's instruction, providing: "[I]n this sort of case you are the judges of the law and the facts, the law as well as the facts, but you are to take the law from the court as the proper source of information."   120 A. at 554.   The Supreme Court of Pennsylvania noted that correctness of the instruction "is now settled in Pennsylvania," holding: "There is nothing in the instructions of which defendant can justly complain.   It is the duty of the jury to take the law from the court, to the same extent in a criminal case as in any other, and a trial judge can properly so instruct."   120 A. at 554.   Further, the Supreme Court of Illinois in 1931 held unconstitutional a statute which provided that juries in criminal cases are the judges of both fact and law, reasoning that the statute "abrogates an essential attribute of the trial of a criminal case by a jury as known to the common law, and results in the deprivation of a right which has been uniformly guaranteed by our successive Constitutions."   People v. Bruner, 343 Ill. 146, 156, 175 N.E. 400 (1931).   The Supreme Court of Illinois cites to Sparf v. United States as authority for the proposition that, at common law, it was a jury's duty to take and apply the law as the judge gave it to the jury.   See People v. Bruner, 343 Ill. at 153 (noting that the Supreme Court in Sparf v. United States, "following the rule and practice at common law, [held that] it was the duty of the jury in every criminal case . . . to take the law from the court and to apply the law so received to the facts as they found them from the evidence").

- 32 -

3.     **The Jury's Current Role**.

"It is well-established that the court instructs the jury as to the rules of law and that the jury

applies the facts as they find them to those rules."   United States v. Grismore, 546 F.2d 844, 849

(10th Cir. 1976)(citing Sparf v. United States, 156 U.S. at 51).   "One touchstone of a fair trial is an

impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before

it.'"   McDonough Power Equipe., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(quoting Smith v.

Phillips, 455 U.S. 209, 217 (1982)).   A juror meets the constitutional standard for impartiality

where the juror "can lay aside his opinion and render a verdict based on the evidence presented in

court."   Patton v. Young, 467 U.S. 1025, 1037 n.12 (1984).   As the Tenth Circuit has explained, a

"defendant's right to an impartial jury does not include a right to a jury composed of persons who

will disregard the district court's instructions."   United States v. James, 203 F.3d 836, No. CR

98-1479, 2000 WL 136816, at *3 (10th Cir. Feb. 7, 2000)(unpublished table decision).[3]   Cf.

United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir. 2003)("The instructions as a whole

need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury

understood the issues to be resolved and its duty to resolve them.")(quoting Medlock v. Ortho

Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

---

[3] United States v. James is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that United States v. James and United States v. Gehringer, 385 F. App'x 830 (10th Cir. 2010)(unpublished), have persuasive value on a material issue and will assist the court in its disposition of this Memorandum Opinion and Order.

The Tenth Circuit has held that "there is no right to jury nullification."   Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999).   Jury nullification is defined as a

> jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.

Jury Nullification, Black's Law Dictionary at 936 (9th ed. 2009).   "'While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath.'"   United States v. Gonzalez, 596 F.3d 1228, 1237 (10th Cir. 2010)(quoting United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)).   "[W]e disapprove of the encouragement of jury nullification."   United States v. Gonzalez, 596 F.3d at 1237.   The Tenth Circuit in Crease v. McKune cited with approval the United States Court of Appeals for the Second Circuit's holding in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), in which the Second Circuit stated that "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."   116 F.3d at 615.   Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."   United States v. Rith, 164 F.3d 1323, 1337 (10th Cir. 1999).   See United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(holding that criminal defendants are "not entitled to jury nullification instructions").

In United States v. James, the Tenth Circuit upheld a district court judge's sua sponte dismissal of a potential juror who stated his belief that the juror had the power to disregard the judge's admonition on the law and acquit if the juror felt it just to do so.   See 2000 WL 136816, at

- 34 -

*4.   The district court judge asked the juror, an emeritus professor of law at the University of

Denver, whether he was "willing to accept the law from me as I give it in the instructions," to

which the juror responded that his "inclination is to follow the judge's instructions."   2000 WL

136816, at *2.   The juror noted, however, that he had one "qualm" and that was the view that "a

jury always has the power to acquit . . . . [n]ot withstanding the evidence."   2000 WL 138816, at

*2.   The judge then, immediately, sua sponte dismissed the juror and provided the follow

explanation to the venire:

> Now, we were on the subject of experience with the law.   I just excused the
> professor because he expressed a view that the jury can disregard the law.   I'm
> surprised to hear that's being taught, if it is being taught.   But at any rate, that's not
> the law. As I have explained patiently and carefully, the jury has to accept the law
> as it is, and it's up to the jury to decide on the evidence, you know, whether the
> evidence meets this high standard of proof, and can certainly decide on an acquittal,
> as he said, if the evidence doesn't persuade or convince you beyond a reasonable
> doubt.   But the jury can't make up the law, and that's the little exchange that we
> had there, and I'm sure you followed along with that, but I wanted to make it plain
> why it was that I excused this teacher.

United States v. James, 2000 WL 138816, at *2.   When the defendant appealed, asserting that the

judge's sua sponte dismissal of the juror and instruction to the venire violated his Sixth

Amendment jury trial rights, the Tenth Circuit affirmed, holding:

> In light of his responses to questions during voir dire, the district court did not
> abuse its discretion or commit plain error in sua sponte dismissing [the] prospective
> juror . . . .   A person who is either unwilling or unable to follow the court's
> instructions is not qualified to be a juror.   Nor did the district court commit any
> error when it informed the jurors that it is their obligation to follow the law as it
> instructs. In short, the defendant was not deprived of his right to a fair trial.

2000 WL 138816, at *4.

## LAW RELATING TO JURY KNOWLEDGE OF SENTENCING RAMIFICATIONS

In criminal cases, the United States and the defendant often work together to keep the jury

ignorant of the ramifications of its determination of guilt.   The Supreme Court has consistently directed that, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"   Shannon v. United States, 512 U.S. 573, 579 (1994)(footnote omitted)(quoting Rogers v. United States, 422 U.S. 35, 40 (1975)) .   It is not clear that this ignorance was present at the time of the Sixth Amendment's ratification.

1.      **Jury Knowledge of Sentencing Ramifications at the Founders' Time.**

Colonial and British jurors at the Founders' time came to the courts from the same vicinity as the defendant, "were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments."   United States v. Polizzi, 549 F. Supp. 2d at 406 (internal citations omitted).   Professor Jeffrey B. Abramson has noted that jurors at the Founders' time did not "come to the jury with minute skill in the laws," but rather the local knowledge jurors would have possessed included knowledge of the laws.   Jeffrey B. Abramson, We, The Jury: The Jury System and the Ideal of Democracy 32 (1994).   Professor Abramson explains:

> Not only was formal legal training unnecessary, but jurors did not even need to rely on a judge's instructions to know the common law of the land, rooted as it was in fundamental principles of natural justice. . . .   Thus, members of a Massachusetts grand jury in 1759 were told that they "need no Explanation" as to most legal matters because "your Good Sence & understanding will Direct ye as to them."

Abramson, supra, at 32.   John Adams similarly noted that "in many cases judges gave the jury no instructions on the law."   1 The Legal Papers of John Adams 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

Jurors' knowledge of the law can be seen in a case that the late Professor Julius Goebel, Jr. chronicled, where he notes that, in 1702, a jury verdict was overturned based on the jurors' lack of knowledge about the laws under which the defendant was convicted:

After being tried in a well-publicized trial and found guilty of treason in 1702, Nicholas Bayard, a former commanding officer of the New York militia and mayor of New York under British rule, appealed to the British Crown based on irregularities in the jury composition -- i.e., the jurors' ignorance of the law:

> In his petition and "appeal" to Queen Anne, Nicholas Bayard stated among other things that he had been "convicted by an illegal petty jury of Aliens and Dutch unduely returned and very ignorant of the English Laws and Language". . . .  Among the affidavits taken by John Bridges and Samson Shelton Broughton, under the Queen's order of reference for the collection of evidence in connection with the Bayard appeal, are statements of some of the petit jurors who had joined in the verdict declaring Bayard guilty of high treason. Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors, made oral statements as follows, confirming the allegations made by Bayard in his petition: ". . . these [depend on] their great Ignorance of the Laws of England at that time not knowing what was High Treason . . . the Foreman . . . Did assert it was High Treason . . . to disturb the peace good and quiet of this Government and that Colonell Bayard had disturbed the peace by the addresses and eight or nine jurors were for clearing . . . Bayard but were perswaded by the foreman."

Julius Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York 604 n.7 (1944).  Professor Goebel notes that New York jurors in revolutionary times often mitigated crimes based on their knowledge of the potential sentences that the defendants faced if the jurors found them guilty of the greater crime:

> We have spoken of the grooves in which the jury might exercise its charity: the verdict in thefts for amounts under the 12d. boundary between grand and petit larceny, and the privilege of finding manslaughter, self-defense or accident upon indictments for murder. These prerogatives the juries in New York did not hesitate to assert, and to these old and established powers of mitigation may be added, perhaps, the avoidance in New York of the incidents of felony judgment by the persistent finding of no goods or tenements. Of considerably greater significance than these possible interferences of the jury, but connected therewith in the case of verdicts for crimes of a less degree when murder, burglary, arson, highway robbery and certain others were charged, is the mitigation obtained by benefit of clergy.

Goebel & Naughton, supra, at 751 (footnote omitted)(emphasis added).  "[T]he benefit of the clergy," was a system of mitigation in which a first-time offender convicted of a lesser crime would be branded on the thumb rather than sentenced to death.  United States v. Polizzi, 549 F. Supp. 2d at 411 (quoting John H. Langbein, The Origins of the Adversary Criminal Trial 193 (2003)).  See 1 Sir William Blackstone, Commentaries on the Laws of England: In Four Books 1753 (William D. Lewis ed., 2007)(noting that "the benefit of the clergy at present stand[s] . . . considerably different from its original institution . . . [,] what was at first an unreasonable exemption of particular popish ecclesiastics into a merciful mitigation of the general law with respect to capital punishment").

Sir Dudley Ryder, who served as a trial judge for the trial judiciary of the Old Bailey[4] from 1754 to 1756, at least in one case, instructed the jury on the possible ramifications of a guilty verdict at trial, and documented his belief that the jury determined the verdict based on availability of the benefit of the clergy:

> Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money.  The [Old Bailey] report of the outcome is as curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment).  Ryder's notes explain why.  "The jury found him guilty to the value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy.  It is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's prerogative of 'valuing' the loot.  Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense.  The convention of the day, immortalized in Blackstone's phrase as the

---

[4] Old Bailey was London, England's central criminal court from 1674 to 1913.  See The Proceedings of Old Bailey, http://www.oldbaileyonline.org/index.jsp (last visited Mar. 23, 2013).

jury's "pious perjury," was that the jury could "downvalue" the goods, in this instance to thirty-nine shillings, in order to consign the convict to the lesser sanction of transportation for seven years.

John H. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources, 50 U. Chi. L. Rev. 1, 22 (1983)(footnotes omitted)("Ryder Sources").   Professor John H. Langbein, Sterling Professor of Law and Legal History at Yale Law School, concludes from Sir Dudley Ryder's notebook chronicling many of his trials during his tenure on the Old Bailey bench that the paramount, if not only, purpose of the jury was to determine the sentence:

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings. The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping. . . .
>
> The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict.   Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, sentence is what was at stake when these cases were "contested."

Ryder Sources, supra, at 41, 55 (footnotes omitted).   Professor Langbein notes that, in Sir Dudley Ryder's two years on the bench at Old Bailey, although he tried over one-hundred and seventy-one cases, there were only sixteen different crimes with which the defendants were charged.   See Langbein, supra, at 42.   Professor Langbein, in addition to reviewing Sir Ryder's notebook, also reviewed a group of reports called the Old Bailey Session Papers ("OBSP") from the 1670s to the 1730s, concluding:

> [T]he jury of that time had a large role in what we think of as sentencing, that is, in determining the sanction. In a significant fraction of the cases that went to trial, the

real issue was whether the jury would choose to exercise its power to "value" stolen goods in ways that would affect the applicable sanction. It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions of transportation and death by so characterizing the crime that only a lesser sanction could be invoked. If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term. Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb. The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding. It could be argued that in all these situations the jury was in reality discharging a sentencing function, and even today we expect sentencing officers to consult past conviction evidence.  But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench.

John H. Langbein, <u>The Criminal Trial Before the Lawyers</u>, 45 U. Chi. L. Rev. 263, 303-04 (1978) (footnotes omitted).

In <u>United States v. Battiste</u>, the case in which Justice Story first intimated that it was the jury's duty pursuant to the Sixth Amendment to follow the law as the judge provides it to the jury, the judge read to the jury the indictment, which included the mandatory sentence for conviction. <u>See</u> 24 F. Cas. at 1044.   The indictment included the statutory language for the law under which the defendant was convicted, providing in relevant part, "if any citizen . . . shall land   . . . on any foreign shore, [and] seize any negro or mulatto . . . with intent to make such negro or mulatto a slave . . . such citizen or person shall be adjudged a pirate, and on conviction thereof . . . shall suffer death."   24 F. Cas. at 1044.

### 2.   <u>Jury Knowledge of Sentencing Ramifications in Modern Times</u>.

"It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"   <u>Shannon v.</u>

United States, 512 U.S. at 579 (quoting Rogers v. United States, 422 U.S. at 40).   The Supreme

Court explains that its reasoning for doing so is to avoid confusion and keep separate the jury's

fact-finding role from the judge's role in determining the sentence the law requires:

> The principle that juries are not to consider the consequences of their verdicts is a
> reflection of the basic division of labor in our legal system between judge and jury.
> The jury's function is to find the facts and to decide whether, on those facts, the
> defendant is guilty of the crime charged. The judge, by contrast, imposes sentence
> on the defendant after the jury has arrived at a guilty verdict. Information regarding
> the consequences of a verdict is therefore irrelevant to the jury's task. Moreover,
> providing jurors sentencing information invites them to ponder matters that are not
> within their province, distracts them from their factfinding responsibilities, and
> creates a strong possibility of confusion.

Shannon v. United States, 512 U.S. at 579.   In support for this proposition, the Supreme Court

cites to Rogers v. United States, in which the Supreme Court held that the district court erred when,

without notice to the defendant and out of the defendant's presence, it answered in the affirmative

a communication which the jurors sent during their deliberations inquiring whether the court

would accept a verdict of guilty as charged "with extreme mercy of the Court."   422 U.S. at 37,

40.   The Supreme Court concluded that the district court's statements to the jurors irreparably

prejudiced the defendant, reasoning that the court's statements might have induced a verdict that

the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without
> reaching a verdict, returned a verdict of "guilty with extreme mercy" within five
> minutes "after being told unconditionally and unequivocally that it could
> recommend leniency," strongly suggests that the trial judge's response may have
> induced unanimity by giving members of the jury who had previously hesitated
> about reaching a guilty verdict the impression that the recommendation might be an
> acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (internal citations omitted)(quoting United States v. Glick,

463 F.2d 491, 495 (2d Cir. 1972)).

The Tenth Circuit has stated: "The authorities are unequivocal in holding that presenting

- 41 -

information to the jury about possible sentencing is prejudicial.   Breach of this standard has often

been grounds for reversal."   United States v. Greer, 620 F.2d 1383, 1384 (10th Cir. 1980).   The

Tenth Circuit has held specifically that an instruction on possible minimum sentences is not

required absent a jury's required participation in sentencing, and that a district court has no

discretion to instruct the jury on sentencing ramifications.   See United States v. Parrish, 925 F.2d

at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly omitted

because the offenses do not specifically require jury participation in sentencing."); United States v.

Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010)(unpublished)("In light of established Tenth

Circuit and Supreme Court authorities, the district court had no discretion to instruct the jury on

the sentencing penalties, and therefore did not abuse its discretion in denying the defendant's

request.").

## ANALYSIS

Courtney contends that the United States' efforts to keep the jury ignorant of the

ramifications of its guilt determination ignores the deep historical roots of the jury and denigrates

its sacred role as the last stalwart standing before tyranny.   The Court concludes that the

common-law jury knew about the sentencing ramifications and used that knowledge in reaching

the verdict.   Because withholding from contemporary juries knowledge about the sentencing

ramifications of a jury verdict leaves jurors without knowledge that, at the Framers' time, would

have been important in reaching the verdict, the courts' practice today is inconsistent with the jury

trial right as the Framers understood that right.   Courtney additionally argues that the Supreme

Court's recent declaration that the Sixth Amendment jury trial right must be upheld as it was at the

time of the Framers is inconsistent with the lack of modern candor with the jury about its

nullification power.   The Court concludes that courts at the Founders' time instructed the jury about its nullification power, because courts instructed the jury that its role included ultimately determining both the fact and the law.   Additionally, defendants' lawyers at the Founders' time were permitted to argue openly to the jury that it should exercise its nullification power.   The Court therefore concludes that the Supreme Court's and Tenth Circuit's requirements to keep out any mention of the jury's ability to nullify and to prevent any lawyer from mentioning to the jury that it can mitigate or nullify its verdict is inconsistent with the Framers' intent in preserving the jury trial right in the Sixth Amendment.   Nevertheless, because, as a district court, the Court must faithfully apply controlling Supreme Court and Tenth Circuit precedent, the Court will deny Courtney's Motion.

I.      **THE COURT CONCLUDES THAT, ALTHOUGH THE COMMON-LAW JURY WAS INFORMED ABOUT SENTENCING RAMIFICATIONS, UNDER CONTROLLING PRECEDENT, THE COURT CAN INFORM THE JURY OF THE POSSIBLE PENALITIES ONLY IF A STATUTE REQUIRES THE JURY'S PARTICIPATION IN SENTENCING.**

The United States relies upon United States v. Parrish and United States v. Greer for the proposition that a jury can be informed of the possible penalties of a defendant's conviction only if the jury's participation in sentencing is required.   Courtney concedes that the Supreme Court has not expressly determined the issue whether this determination is unconstitutional because it is inconsistent with the Framers' intent in adopting the Sixth Amendment, but contends that the Supreme Court implicitly overturned United States v. Parrish and United States v. Greer, and rejected the distinctions upon which the Tenth Circuit relied to reach its ruling.   See United States v. Booker, 543 U.S. at 404; Blakely v. Washington, 542 U.S. at 296; Jones v. United States, 526 U.S. at 227.   Regardless how the Court interprets history, the Court, as a district court, is not free

to say that a recent Supreme Court decisions has implicitly overruled Tenth Circuit opinions; that latter task is one for the Supreme Court and the Tenth Circuit.

A.      HISTORICALLY AND AT THE FOUNDERS' TIME, THE COMMON-LAW JURY KNEW THE RAMIFICATIONS OF ITS VERDICT.

Changes in juror qualifications has resulted in a situation in which, at the time that the Founders ratified the Sixth Amendment, the common-law juries were vastly different than our contemporary juries.   Whereas Professor Goebel notes that New York juries had a "high property qualification . . . , which rested upon the presumed higher responsibility and intelligence of propertied persons," courts today do not require property ownership, let alone a high property value qualification, as a pre-requisite for juror qualification.   New Mexico state courts do not get their jury pool from property ownership records, but rather from the Department of Motor Vehicles, or, in the United States District Court for the District of New Mexico, from the State of New Mexico's voter registration list.   See Misc. No. 08-00004-40, Order Adopting Modified Jury Plan ¶ 4, at 2, filed December 2, 2008.   Similarly, whereas Judge Weinstein notes that colonial and British jurors at the Founders' time "were from the vicinage, were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments,"   United States v. Polizzi, 549 F. Supp. 2d at 406 (internal citations omitted), the jurors today do have those same requirements and do not often have those same qualities.   See also J. Goebel & T. Naughton, supra, at 603 (noting that "The [New York] Judicature Act of 1691 and 1692 also contained provisions that no man's rights or property should be determined . . . unless the facts be found by verdict of twelve men of the neighborhood.")(emphasis added). Although the jury pools contain only persons who are registered to vote in a certain New Mexico County, or licensed to drive in the state, especially in a large state like New Mexico with a smaller

- 44 -

population density, jurors may not hail from within what in the eighteenth century would have been considered the defendant's vicinity.

The twenty-first century American jury pool has less knowledge about the law than the common-law jury pool of the Founders' time.   As Professor Langbein points out in looking back at Sir Ryder's personal notebook from 1754 to 1756, in two years on the bench at the central criminal court in London, trying over one hundred and seventy cases, there were only sixteen laws with which a mid-eighteenth century Londoner may have been charged, and with which the freeholder jury pool would thus likely have been familiar.   See Ryder Sources, supra, at 42.   In modern times, however, "[f]or decades, the task of counting the total number of federal criminal laws" has been attempted by "lawyers, academics and government officials," largely without success: A 1982 United States Department of Justice study attempting to count the number of federal criminal laws as part of an effort to persuade Congress to revise it, "produced only an educated estimate: about 3,000 criminal offenses."   Gary Fields & John R. Emshwiller, Many Failed Efforts to Count Nation's Federal Laws, Wall St. J., July 23, 2011.   Thus, while Professor Abramson notes that jurors in the late-eighteenth century American colonies did not "come to the jury with minute skill in the laws," the local knowledge jurors would have possessed included knowledge of the laws.   J. Abramson, supra 32.   The same cannot be said for contemporary juries in federal courts.   The extent of colonial juries' knowledge of the law is exemplified by the 1702 trial of Nicholas Bayard, a New York mayor while under British rule, who appealed his conviction on grounds that the trial was improper, because two of the jurors did not have their own independent knowledge of treason's elements, "but were perswaded [sic] by the foreman."   J. Goebel & T. Naughton, supra, at 603.

- 45 -

At the time of the Sixth Amendment's ratification, juries knew what the ramifications of a guilty verdict would be, because of the limited sentences available.   Importantly, of the sixteen offenses at issue in the Old Bailey trials, only two of those sixteen laws were misdemeanors, while the rest were felonies.   Ryder Sources, supra, at 42.   At that time, juries knew well the repercussions of a guilty verdict; for the fifteen felonies: the first offense was the benefit of the clergy, which meant the judge would choose between seven years' banishment or immediate release with a branding on the thumb, and the second offense was death.   See Ryder Sources, supra, at 39.   For misdemeanors, although the judge had more discretion, it was almost invariably lashings.   See Ryder Sources, supra, at 53.   Thus, juries at the Founders' time likely knew a substantial amount more about the law with which the defendant was charged, and almost certainly knew the repercussions of a guilty verdict.

The Supreme Court, in its recent sentencing decisions discussing the Sixth Amendment jury trial right as it existed at the Founders' time, has similarly noted both the vicinity tenet and that offenses were sanction-specific at that time.   In Blakely v. Washington, the Supreme Court noted that a tenet of the Sixth Amendment jury trial right at the Founders' time was "that the 'truth of every accusation' against a defendant should afterwards be confirmed by unanimous suffrage of twelve of his equals and neighbours . . . ."   542 U.S. at 301 (quoting 4 W. Blackstone, supra, at 343).   The Supreme Court in Apprendi v. New Jersey recognized that, at least with respect to felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing.   The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense."   530 U.S. at 479.   Cf. id. at 481 (noting that there was a "19th-century shift in this country from statutes providing fixed-term sentences to

those providing judges discretion within a permissible range").   The Supreme Court has noted the very limited sentences available to American judges at the Founders' time and the nature of mandatory sentencing apart from its recent sentencing opinions: "In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature.   Each crime had its defined punishment."   United States v. Grayson, 438 U.S. 41, 45 (1978).

Even if the Court instructed modern-day juries that the crime with which the defendant in the case is charged is a felony or a misdemeanor, given the multiple crimes with specific statutory minimum and maximum sentences, those juries could still not likely know the possible sentences the defendants face if found guilty.   Whereas the Supreme Court noted in Apprendi v. New Jersey that the nineteenth century saw a shift from mandatory, definite sentences to a sentence range imposed at the court's discretion, because courts today are not permitted to inform the modern-day jury about the possible sentencing range flowing from defendants' guilty verdicts, and given the complexity of the United States Sentencing Guidelines, the modern-day jury is likely without knowledge of the possible sentencing ramifications of their guilty verdict. The Court, in its experience on the bench, has found that present-day jurors, beyond lacking knowledge about sentencing ramifications for felonies or misdemeanors, often do not recognize the difference between criminal and civil jury trials.   Numerous times conducting voir dire, when the Court inquired about a potential juror's past experience on a civil or criminal jury trial, the juror's answers show that what the juror believes was a criminal trial, was actually civil, and vice versa. Judge Weinstein has similarly pointed out that the vast difference between late-eighteenth century

juries' knowledge about criminal law and sentencing ramifications of guilty verdicts, and juries'

contemporary knowledge, is not surprising given the vast difference in criminal law as it then

existed compared with the law today: "Criminal law then was much simpler than today, now

requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of

statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms,

treatment for mental health and other problems in and out of prison, sentencing guidelines, case

law and local practice."   United States v. Polizzi, 549 F. Supp. 2d at 407.   In light of the small

number of offenses in the late-seventeenth century and eighteenth century, and that there were

only two sanctions available for a felony conviction, support for withholding sentencing

information from the jury, and the jury's resulting lack of knowledge, cannot be found in the

historical reality of the common-law jury known to the Founders at the time of the Sixth

Amendment's ratification.

> **B.     JURORS ON COMMON-LAW JURIES USED THEIR KNOWLEDGE OF THEIR VERDICT'S SENTENCING RAMIFICATIONS IN REACHING THEIR VERDICT.**

Juries at the Founders' time not only knew about the sentencing ramifications of their

verdicts, but historical evidence shows that juries weighed heavily the defendant's sentence in

reaching their verdicts.   In looking at jury verdicts throughout the eighteenth century in colonial

New York, Professor Goedel concludes:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's
> prerogative -- the power to effect a mitigation in the severity of the law by verdicts
> which would let off an obvious offender with penalties less than the worst of the
> charges against him would make inevitable. This power was not confined to the
> selection of a relatively innocuous count on which to return a conviction, but
> extended, as indicated above, to a finding of an offense less in degree than that
> charged in the indictment. The importance of this rule in the case of felonies was
> obvious, since it was possible thus for the defendant to pray clergy and escape the

        rigor of the otherwise inevitable judgment of life and limb.

J. Goebel & T. Naughton, <u>supra</u>, at 673 (footnotes omitted).  The eighteenth-century jury in England also consistently exercised its power to effect a mitigation of the defendant's sentence. Professor Langbein notes that "only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence . . . .   To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings." <u>Ryder Sources</u>, <u>supra</u>, at 41.  Professor Langbein provides the common example in which a jury found that the value of stolen goods was thirty-nine shillings, because at a value of forty shillings, the defendant lost ability for application of the benefit of the clergy and, thus, was necessarily sentenced to death.  <u>See</u> <u>Ryder Sources</u>, <u>supra</u>, at 22 ("Ryder's notes explain   . . . 'The jury found him guilty to value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy . . . in order to consign the convict to a lesser sanction of transportation for seven years.'").

        The Supreme Court has twice noted the common-law jury's mitigation power stemming from their knowledge of the repercussion of guilty verdicts.  In <u>Jones v. United States</u>, the Supreme Court noted that "competition developed between judge and jury," and provided the jury's mitigation power as an example: "The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences."   <u>Jones v. United States</u>, 526 U.S. at 245.   In <u>Apprendi v. New Jersey</u>, the Supreme Court again referenced this mitigation power, noting that, at the Founders' time:

> [J]uries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant.  Id. at 245 . . . ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part.  4 Blackstone 238-239").

Apprendi v. New Jersey, 530 U.S. at 480 n.5.   It is thus clear that the Supreme Court's conception of the common-law jury which the Sixth Amendment protects includes a jury with knowledge of the sentences a guilty defendant faces and a jury that uses this knowledge to reach its verdict.

It may be suggested that this recognition that there was knowledge germane to common-law jurors, without more, does not clearly suggest that withholding knowledge about sentencing ramifications is inconsistent with the Sixth Amendment's jury trial right.  If, for instance, a juror at the Founders' time knew the sentence that a guilty defendant faced only because there existed a very limited number of laws, and a much more limited class of potential sentences, the courts' refusal today to institute a change to affirmatively provide to the jury this information does not clearly violate the defendant's Sixth Amendment right.   It seems tenuous to argue that knowledge lost because the jury pool has enlarged since the Sixth Amendment's ratification, or knowledge lost because the jurors in the jury pool are less educated about the criminal law, without any affirmative conduct on the courts' behalf -- without more -- implicates the Sixth Amendment.   The Supreme Court has recognized that the Sixth Amendment "limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury," Blakely v. Washington, 542 U.S. at 308; a change resulting from the inclusion of a broader base of citizens in the jury pool, or from an evolution of the jurors in the jury pool, without courts' affirmative exertion of power, may not implicate the Sixth Amendment jury trial right.   On the

other hand, however, even if the jury's lack of knowledge about the sentence that the defendant faces is because the modern-day jury is left without information that appears to have been important to the common-law jury's verdict and its power to mitigate the defendant's sentence, the substance of the defendant's Sixth Amendment jury trial right appears to have deteriorated substantially.   See United States v. Booker, 543 U.S. at 237 (stating that the Supreme Court's holding that the Sentencing Guidelines are unconstitutional if mandatory "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance").   To be consistent with what the Framers thought a jury was at the time of the Bill of Rights' adoption, it may no longer be defensible to keep the jury so ignorant of the verdict's sentencing ramifications.

C.   **WITHHOLDING KNOWLEDGE ABOUT SENTENCING FROM THE MODERN-DAY JURY LEAVES THE JURY WITHOUT KNOWLEDGE THAT IT WOULD HAVE HAD AT THE FRAMERS' TIME.**

Judicial power as it relates to sentencing in the modern criminal court system appears to infringe on the Sixth Amendment's reservation of jury power in two interrelated areas.   The first is that the Sentencing Guidelines have caused, at least in part, the modern-day jury's ignorance of the ramifications of a guilty verdict.   Although, at the Framers' time, judges had discretion with regard to sentences for misdemeanors -- largely between corporal punishment and banishment -- for felonies, judges until the nineteenth century had no discretion in relation to sentencing.   See Apprendi v. New Jersey, 530 U.S. at 481 (noting "the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges with discretion within a permissible range"); id. at 482 (noting "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties . . .");

Ryder Sources, supra, at 41 (noting the mandatory sentences for felonies were either transportation/banishment if the benefit of the clergy was available, or death if not, and, for misdemeanors, was transportation or whipping).   While Congress' power to make law includes "the power to fix the sentence for a federal crime," Mistretta v. United States, 488 U.S. 361, 364 (1989), Congress' creation of over three thousand federal laws presents significant problems for jurors who may wish to educate themselves about sentencing repercussions for certain criminal offenses, and the federal Sentencing Guidelines have made self-education of potential sentences virtually impossible.   Although a juror may be educated about a statutory minimum and maximum, a juror likely cannot educate him or herself about a particular defendant's potential sentence, as the Guidelines take into account the defendant's circumstances and the circumstances surrounding the crime, and, after United States v. Booker, allow a judge to depart from a Guidelines sentence.   Thus, the Sentencing Guidelines, enacted pursuant to Congress' power to make laws and to delegate that power, see Mistretta v. United States, 488 U.S. at 361, have necessarily eroded the jury's ability to take into consideration the potential sentence that the defendant faces, and thus eroded their ability to use their mitigation power, see Apprendi v. New Jersey, 530 U.S. at 483 (noting "the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion'")(quoting Jones v. United States, 526 U.S. at 247-48).

Second, while the Sentencing Guidelines find some support in the judges' discretion at the Framers' time to sentence within a prescribed range -- even if it only applied in the limited situations of misdemeanors -- the prohibition on any mention to the jury of sentencing implications of a guilty verdict does not find the same support.   Sir Ryder, while on the bench at Old Bailey, noted particularly one situation in which the jury returned a guilty verdict finding that the

defendant stole goods worth thirty-nine shillings, and credits the jury's finding to the fact that they found that amount "after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy."   Ryder Sources, supra, at 22 (internal footnote omitted).   Sir Ryder in the 1750s thus, at least, was not required to keep information about the sentencing implications of the jury's verdict from the jury.   Similarly, in United States v. Battiste, Justice Story in 1835 read to the jury the statute pursuant to which the defendant was charged, which included the sentencing ramification: "death."   24 F. Cas. at 1044.   It is therefore clear that judges were not precluded from informing juries about the verdict's sentencing implications.

### D.   WHERE THE VERDICT DOES NOT ALTER THE MINIMUM AND/OR MAXIMUM SENTENCE IMPOSED ON THE DEFENDANT, THE COURT IS NOT FREE TO GIVE THE JURY SENTENCING INFORMATION.

Neither Tenth Circuit nor Supreme Court precedent go as far as prohibiting, wholesale, any mention of possible sentences.   Rather, the modern-day principle is limited to those situations in which "a jury has no sentencing function."   Shannon v. United States, 512 U.S. at 579.   The Supreme Court in Apprendi v. New Jersey held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, and the jury is thus required to participate in finding a fact that, by changing the mandatory maximum, changes substantially the nature of the sentence.   Similarly, in Jones v. United States, the Supreme Court construed 18 U.S.C. § 2119 to constitute three separate offenses, rather than one sentence with three factual considerations for sentencing, because it reasoned that, to leave to a judge factual findings which would mean the difference between a sentence of up to fifteen years, up to twenty-five years, or up to life, implicates the defendant's Sixth Amendment jury trial right.   On the one hand, the

Supreme Court's constitutional requirement that a jury participate in fact-finding where the fact is necessary to a sentence with a substantially different punishment is analogous to the factual finding required in the case noted by Sir Riley, where the jury was to determine whether the total value of stolen goods was forty shillings or more, as a finding of forty shillings makes mandatory a death sentence and precludes the possibility of the benefit of the clergy.   Similarly, whereas Justice Story in United States v. Battiste instructed the jury by reading them the statute which included the punishment -- death -- contemporary juries are instructed if the death sentence is a possible punishment for their potential jury's return of a guilty verdict.   Moreover, it is possible that modern-day juries know whether the return of a guilty verdict in a capital case -- such as first-degree murder -- in their jurisdiction puts at issue a possible death sentence.   On the other hand, however, in Sir Riley's example, he appears to not only to have required the jury to find a fact upon which an enhanced sentence depends, but to have gone further and instructed the jury specifically about the implications of finding the particular fact.   Sir Riley notes that "I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy," Riley Sources, supra, at 22; by telling the jury that fact, he instructed them specifically that the implications of the factual finding meant an increased maximum sentence, or, rather, the preclusion of anything except for the maximum sentence.   Even when a juror's participation is required to enhance a mandatory minimum sentence, modern-day courts do not instruct the jury on the sentencing implications of the factual findings that they make.   In the case of drug-trafficking, for example, where the amount of the drugs in which the defendant traffics determines the statutory maximum and minimum, the jury is not told, as Sir Riley told the jury the line at which the possible relief from the death sentence becomes impossible, that there is a line at which the

statutory maximum and minimum sentence changes.  Requiring courts to withhold from jury instructions the ramifications of a guilty verdict therefore violates the defendant's Sixth Amendment jury trial right as the Founders thought of that right.

Current Supreme Court and Tenth Circuit law, however, makes clear that withholding sentencing information from juries not directly participating in sentencing does not unconstitutionally invade the province of the jury.  The Supreme Court, in the majority opinion that the Honorable John Paul Stevens, Associate Justice, authored in Apprendi v. New Jersey, recognized that there are organic changes which take place in trial practices without violating the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost only by gross denial, but by erosion.'"  530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48).  The Supreme Court has thought that the evolution of courts' practice to prohibit instructions about sentencing ramifications where the jury's factfinding does not fundamentally affect the defendant's sentencing ramifications to avoid "distract[ing] them from their factfinding responsibilities, and creat[ing] a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, is such a constitutional change in trial practice.  The Supreme Court's recent sentencing opinions, moreover, are susceptible to a narrow construction of the Sixth Amendment's jury trial right.  The Supreme Court in Booker v. United States held that the Sentencing Guidelines' mandatory nature is unconstitutional, because the Guidelines, in taking into consideration the defendant's relevant conduct, often produced a sentencing range higher than the mandatory maximum allowed based on facts which the jury found.  Because requiring a sentence imposed beyond the maximum sentence that the jury's verdict allowed violated the

- 55 -

defendant's Sixth Amendment jury trial right to "in a meaningful way guarantee[] that the jury would still stand between the individual and the power of the government under the new sentencing regime," the Supreme Court construed the Sentencing Guidelines as advisory, rather than mandatory.  Booker v. United States, 543 U.S. at 237.  The Supreme Court noted that this construction "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance."  543 U.S. at 237.  In Apprendi v. New Jersey, the Supreme Court quoted its recognition in Jones v. United States that the Sixth Amendment's substance, as the Founders saw it, is its protection against substituting new methods of trial in place of the jury trial:

> As we stated in Jones: "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)."

530 U.S. at 484, n.11 (quoting Jones v. United States, 526 U.S. at 248)(emphasis added).  See Booker v. United States, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury in criminal cases.")(quoting The Federalist No. 83). Thus, whereas the Supreme Court has held that certain facts necessary to imposing a greater mandatory maximum statutory sentence require jury participation in finding those facts, substituting a court's finding of those facts, especially where the standard of proof is a preponderance of the evidence rather than beyond a reasonable doubt, would effectively introduce a new method of trial.  The Supreme Court's recent sentencing decisions requiring jury

participation in this factfinding and precluding a court's substitution of facts for the jury's, therefore, preserves the jury's factfinding role as it existed at the Founders' times.   Presumably the Supreme Court justifies the contemporary practice to withhold sentencing ramifications from the jury at trial where its factfinding does not substantially affect the sentence imposed -- i.e., does not affect the range in which the judge can exercise discretion -- does not effectively introduce a new arbitrary method of trial as a substitute for a jury trial, but rather continues the practice of allowing the judge to exercise discretion in sentencing.   See Apprendi v. New Jersey, 530 U.S. at 482 n.9 (noting that, "[u]nder the common-law procedure, the court determines in each case what within the limits of the law shall be the punishment -- the question being one of discretion" (emphasis in original))(quoting 1 J. Bishop, Criminal Law §§ 933-934(1) (9th ed. 1923)).   The Supreme Court in Booker v. United States noted that, as Hamilton wrote in The Federalist No. 83, the Framers' intent in ratifying the Sixth Amendment was to protect from judicial despotism by mandating a jury trial in criminal cases; the Supreme Court has apparently concluded that to withhold instruction about sentencing ramifications from a jury whose facts do not affect the defendant's possible mandatory maximum sentence does not change that the criminal jury trial right is exercised, and fully protected and satisfied, when the jury finds as fact whether the defendant committed the crime.   Moreover, the Supreme Court has apparently decided that, in a contemporary society in which Congress has enacted over three thousand federal criminal laws and substituted mandatory criminal sentences for the Sentencing Guidelines, the requirement to withhold jury instruction about possible sentences stems from the concern their knowledge of sentencing ramifications "distracts them from their factfinding responsibilities, and creates a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, and that keeping the

jurors ignorant preserves the defendant's criminal jury trial right.

The Supreme Court's conclusion that withholding sentencing information may help protect the defendant's Sixth Amendment jury trial right finds support in the Supreme Court's decision in Rogers v. United States, in which the Supreme Court held that the district court erred when it told the jury that it would accept a guilty verdict "with extreme mercy of the Court."   422 U.S. at 40. The Supreme Court reasoned that the defendant was irrevocably prejudiced by the district court's statements to the jurors, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (internal citations omitted)(quoting United States v. Glick, 463 F.2d at 495).   Were district courts to instruct the jury about the defendant's possible sentence, there is then the issue of what the Court would say.   The Court could likely give only statutory minimum and maximum or instruct the jury about the Sentencing Guidelines and their advisory nature.   The Sentencing Guidelines are often difficult for those with legal training to understand, and the Supreme Court's concern for instructions about sentencing possibilities leading to jury confusion could come to fruition rather quickly.   Moreover, defendants may find that, as the jury in Rogers v. United States quickly decided to convict after they learned that the court may be lenient toward the defendant, knowledge about the Sentencing Guidelines range the defendant faces, and the possibility that a court may vary downward from the guidelines sentence, may result in a guilty verdict where a jury might not otherwise reach one.   While the discretion to inform the

jury about possible sentences would likely be left to the defendant's wishes whether to so instruct the jury, the defendant may learn to be careful for what he or she wishes.

Thus, the Court does not minimize the difficulties that fully informing the jurors about the sentencing ramifications of their verdict would present.[5]   There are good prudential reasons why the modern American court system has decided to tell the jury not to think about sentencing.   The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism.   To keep the jury ignorant of sentencing ramifications is not consistent with the concept of a jury trial at the Founders' time.   To fully protect the defendant's right to a jury trial, it appears necessary to allow him or her to advise the jury about the sentencing ramifications of its verdict.

Nevertheless, the district court is obligated to follow controlling Supreme Court and Tenth Circuit precedent.   See, e.g., Zamora v. Wells Fargo Home Mortg., 831 F. Supp. 2d 1284, 1305 (D.N.M. 2011)(Browning, J.)("While the Court realizes that its decision . . . may in some ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit.").   These courts have been very clear about what a trial court should do: the trial court is not to present any information about possible sentencing unless the jury's participation in sentencing is required.   See Shannon v. United States, 512 U.S. at 579 ("It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'")(quoting Rogers v. United States, 422 U.S. at 40);

_____

[5]  After Blakely v. Washington and before Booker v. United States, the Court and the Honorable Bruce D. Black, United States District Judge for the District of New Mexico, submitted guidelines enhancements to the jury, out of concern that an enhancement without the jury finding as fact the underlying conduct, would render the Court's enhancement unconstitutional.   Thus, more jury inclusion can be done.

United States v. Greer, 620 F.2d at 1384 ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.   Breach of this standard has often been grounds for reversal."); United States v. Parrish, 925 F.2d at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation.").   Accordingly, the Court will deny Courtney's request to inform the jury about the sentencing ramifications of its verdict.

## II.   THE SIXTH AMENDMENT JURY TRIAL RIGHT, AS THE SUPREME COURT AND TENTH CIRCUIT CURRENTLY CONSTRUE IT, DOES NOT INCLUDE THE JURY'S RIGHT TO BE INFORMED OF ITS RIGHT TO JURY NULLIFICATION.

Courtney asserts that the Framers' understanding of the jury's role at the time of the Sixth Amendment relied on jury nullification, and asks the Court to modify its instructions to inform the jurors, at least implicitly, of its ability to nullify.   See Proposed Instruction at 2; Motion at 7. According to the United States, Courtney seeks to provide the jury an open invitation to nullify, "a course which has been disapproved by the Tenth Circuit."   Response at 4.   The Court agrees with the United States' reading of current controlling case law, and concludes that the Sixth Amendment jury trial right, as the Supreme Court and Tenth Circuit currently construe it, does not allow the Court to provide the jury an instruction inviting nullification.

### A.   AT THE FOUNDERS' TIME, THE COMMON-LAW JURY'S ABILITY TO FIND THE LAW AS WELL AS THE FACT INCLUDED THE RIGHT TO JURY NULLIFICATION.

As Judge Weinstein notes in United States v. Polizzi: "It was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt.   In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to 'nullify.'"   549 F. Supp. 2d at 405.   Judge Weinstein concludes that "[t]he negative connotations

of this characterization of the jury's power and responsibility ignore history and the meaning of the

Sixth Amendment."   549 F. Supp. 2d at 405.   The history to which Judge Weinstein refers is the

dual roles that the common-law jury played at the Founders' time: its primary role was as

factfinder, but its secondary role was to also find the law, by often acquitting if the jury found the

law unjust.   See I. Horowitz, supra, at 427 ("While the fact-finder role of the jury is the judicially

preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the

jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is

just and what is not.").

The jury's nullification power was well-known and used during the Founders' time, as

common-law juries during the seventeenth and eighteenth century saw the development of the

jury's power to acquit against the facts, or, as it was referenced in the time, to find the law in

addition to the fact.   In the late-seventeenth century, Edward Bushell, who had been imprisoned

for his role in acquitting, against the court's direction to convict, two Quakers of the offenses of

unlawful assembly and breaching the peace resulting from their preaching, petitioned for a writ of

habeus corpus.   See United States v. Polizzi, 549 U.S. at 405; C. Conrad, supra, at 24.   When the

judge instructed the jury about the facts which the prosecution needed to prove to convict, the

judge instructed the jury that the prosecution had proved those facts, and instructed the jury it was

their job to find as fact that the defendants had committed the crimes.   See C. Conrad, supra, at 26

(quoting The Tryal of Wm. Penn and Wm. Mead for Causing a Tumult . . . , How. St. Tr. at 6:951

(1670)).   When the jury refused to convict, and Bushell was imprisoned for his failure thereafter

to pay a fine, Chief Justice John Vaughn of the Court of Common Pleas held that to require a jury

to find guilt because the court believed that all elements of the law were proven is to make use a

jury useless.  <u>See</u> C. Conrad, <u>supra</u>, at 27.  As one scholar notes, Justice Vaughn's decision "ushered in . . . 'the heroic age of the English jury,' during which 'trial by jury emerged as the principle defense of English liberties,'" C. Conrad, <u>supra</u>, at 28 (quoting J. M. Beattie, <u>London Juries in the 1690's</u> 214, <u>in</u>, J. S. Cockburn & Thomas A. Green, Eds., <u>Twelve Good Men and True</u> (1988)), and which influenced the common-law jury to the point that, at the Founders' time, "jury [nullification] [w]as an accepted part of the American law for the next several generations," C. Conrad, <u>supra</u>, at 32.

Jury nullification as part of the Framers' conception of the common-law jury can be seen from Chief Justice John Day's instruction to the jury in the 1794 Supreme Court case, <u>Georgia v. Brailsford</u>, in which he charged the jury about its dual role as both finder of fact and law, stating that the jury had "a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy."  3 U.S. at 4.  Moreover, an example of the jury's secondary role as finder of the law is played out in the case of <u>People v. Croswell</u>, wherein Hamilton was the defense attorney arguing for the increased jury role as finder of the law.   Although tried in a state court, the majority opinion, joined by a future Associate Justice of the Supreme Court of the United States, the Honorable Smith Thompson, noted that "[t]he law and fact are so involved, that the jury are under an indispensable necessity to decide both . . . ."  3 Johns. Cas. at 367.

The Supreme Court in its recent sentencing opinions has not only discussed that the Sixth Amendment jury trial right guarantees the "historical foundation" of the jury as "guard[ing] against a spirit of oppression and tyranny on the part of rulers, and as the great bulwark of our civil and political liberties," <u>United States v. Booker</u>, 543 U.S. at 239 (quoting <u>Apprendi v. New Jersey</u>, 530 U.S. at 477)(internal quotations and alterations omitted), but has specifically pointed out the

jury's nullification power at common law.  The Supreme Court referenced the jury's power to find against the facts that the evidence establishes in both <u>Apprendi v. New Jersey</u> and <u>Jones v. United States</u>, noting that "juries devised extralegal ways of avoiding jury verdicts . . . ." <u>Apprendi v. New Jersey</u>, 530 U.S. at 479 n.5.  In <u>Jones v. United States</u>, the Supreme Court similarly noted that "[t]his power to thwart Parliament and Crown took the form . . . of flat-out acquittals in the face of guilt . . . ."  526 U.S. at 245 (quoting 4 W. Blackstone, <u>supra</u>, at 238-39). The authorities suggest that the common-law jury at the Founders' time had the ability to nullify by acquitting the defendant against the facts that the evidence establishes at trial, or -- as it was referred to at the time -- to determine the law.

The Court concludes that there is therefore a tension between the historical authority about the common-law jury's role and the Supreme Court's finding in <u>Sparf v. United States</u> "that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court."  156 U.S. at 90.  Justice Harlan's inclusion of the word "rightfully" before "refuse" leaves this statement open to interpretation that, although the nullification power was part of the common-law jury's role, it was nevertheless wrongful to exercise it.  Such an argument, however, is irreconcilable with the recent Supreme Court decisions' recognition of the crucial importance of the common-law jury's mitigation power to the Sixth Amendment's preservation of the jury trial right.

### B.   THE COMMON-LAW JURY'S NULLIFICATION ROLE INCLUDES THE RIGHT TO BE INSTRUCTED ABOUT ITS NULLIFICATION RIGHT.

Courtney argues that a lack of candor about the jury's nullification power is a "'secret machination' which will 'sap and undermine' the sacred role of the jury."  Motion at 5 (quoting

Jones v. United States, 526 U.S. at 246.   The historical background suggests that the common-law jury not only used the jury's nullification power, but jury nullification was a well-known, common power of the jury to guard against what they saw as unjust laws.   The historical background also suggests, however, that juries at the Framers' time did not have to be provided instruction about their ability to nullify.   The frequency with which juries mitigated the verdict or acquit a guilty defendant, because they saw the law as unjust, suggests that, jurors knew about their ability to nullify without any information from the courts about that ability, this nullification power was essential "to ensure their control in the judiciary."   Blakely v. Washington, 542 U.S. at 305. Nevertheless, courts at the Founders' time, including the Supreme Court in 1794, instructed juries that it was their right to be the ultimate judge of both the facts and the law.

The case law from the Framers' era discussing whether courts should instruct juries about their ability to determine the law in libel cases, on the one hand, does not necessarily lend support to Courtney's position that courts should inform juries about the ability to nullify the verdict, because, given the special verdict form provided to juries at this time, libel cases may be seen as unique.   Although Hamilton in People v. Croswell used broad and sweeping language to advocate for the jury's role to decide the law in addition to the facts -- and thus to allow them to nullify if they believed the defendant had factually committed the crime -- Hamilton was arguing that it was unconstitutional to take away the jury's power to find that the defendant had the required intent for libel.   In essence he was arguing for the jury's power to reach a verdict, because all that the district court allowed the jury to return in People v. Croswell was a special verdict, limited only to finding whether there was publication and whether the statement's inference was true.   See 3 Johns. Cas. at 342.   Thus, while Justice Kent's language in People v. Croswell is subject to, and often cited

for, a reading that it embraces the jury's role as being able to disregard the law given to them by the court as "the jury are under an indispensible necessity to decide both [the law and the fact]," 3 Johns. Cas. at 366, the court's otherwise unsurprising conclusion is that, in a libel case, "the jury have a right to judge . . . whether it be a libel or not . . . in short, [] 'the whole matter put in issue . . . ,'" 3 Johns. Cas. at 376-77.

The Founders nevertheless believed it proper for the court to instruct the jury on the law. In People v. Croswell, while Justice Kent writes that the jury should decide the whole of the matter, he still notes that it is the court's duty to instruct the jury about the law: "[A]s in other criminal cases, it is the duty of the court, 'according to their discretion, to give their opinion and direction to the jury on the matter in issue,' and it is the duty of the jury to receive the same with respectful deference and attention . . . ."  3 Johns. Cas. at 377.   Justice Kent did not hold that the court had the affirmative obligation to instruct the jury that they were to find the facts as well as the law, but held merely that it was error to deny the jury the ability to exercise its power to, at that time, do both in reaching the ultimate conclusion of guilt or innocence.   Thus, People v. Croswell appears to go only as far as to recognize the longstanding proposition that the jury has the power to nullify, or to decide the ultimate issue of guilt, regardless whether the evidence establishes guilt, but does not stand for the proposition that the defendant has the right to demand instruction from the court about the jury's ability to exercise its nullification power.   Rather, it falls in line with Justice Harlan's conclusion about the common-law jury's role that he articulated in Sparf v. United States:

> [T]he general common-law rule in criminal cases . . . [is that it is] the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as

compounded in the issue submitted to them.

156 U.S. at 98.

Regardless whether libel cases are viewed as unique, however, the historical authority shows that the Founders viewed the jury's role to return a verdict based on its conscience, notwithstanding the court's instructions about the law.  To say that libel cases are unique cannot account for Chief Justice Day's charge to the jury in Georgia v. Brailsford -- not a libel case -- "that by the same law, which recognizes th[e] reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy."  3 U.S. at 4.  Rather, dictionaries at the Founders' time included in the definition of jury: "Juries are . . . not finable [sic] for giving their verdict contrary to the evidence, or against the direction of the court . . . and they may not only find things of their own knowledge, but they go according to their conscience."  Jacob's Law Dictionary (1782)(quoted in C. Conrad, supra, at 46-47.  The historical sources thus show that, not only did the definition of jury as written in the Constitution at the Founders' time include the nullification power, but the authority also shows that the Supreme Court was candid with the jury about its "right to take upon yourselves to judge . . . both . . . the law as well as the fact in controversy."  Georgia v. Brailsford, 3 U.S. at 4 (emphasis added).  Contra Crease v. McKune, 189 F.3d at 1194 ("'[T]he power of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within authority to prevent.'")(quoting United States v. Thomas, 116 F.3d at 615).

**C.    CONTEMPORARY COURTS' WITHHOLDING FROM THE JURY INFORMATION ABOUT ITS MITIGATION OR NULLIFICATION RIGHT HAS LESSENED THE JURY'S CONTROL IN JUDICIAL PROCEEDINGS, AND ERODED AT THE COMMON-LAW JURY'S ROLE.**

The Supreme Court has stated that not all changes to the jury's role implicate the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion.'"   Apprendi v. New Jersey, 530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48).   The question Courtney asks the Court to decide is whether the judicial exertion of power has changed trial practices to the point where the jury trial right has been unconstitutionally eroded or denied.   Requiring courts to keep information about the mitigation or nullification power from the jury has not wholly taken away a defendant's jury trial right.   Given that the Founders contemplated the jury's role to include its right to be the ultimate decider of the law, and also given that the mitigation power played such a large role in the common-law jury's resolution of a case, however, the contemporary judicially created requirement to keep all information from the jury about its "power" to nullify is inconsistent with the Sixth Amendment jury trial right at the Founders' time.

The Supreme Court has noted that "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.   It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury."   Blakely v. Washington, 542 U.S. at 308.   While an organic change leading to the courts' omissions of any information about the jury's nullification would perhaps not be sufficient to find a judicial exertion of power, such a small evolution is not what occurred.   Sparf v. United States and its progeny effectively took

away, by the exertion of judicial power, any possibility that the jury might be informed about its role including its nullification or mitigation power.  The Supreme Court's decision in Sparf v. United States, establishing that it is correct for courts to instruct the jury that the law is the court's determination to make, and solely in its province, and that it is the jury's duty to apply the law as given, is inconsistent with the practices of the Supreme Court in Georgia v. Brailsford, and the Supreme Court of New York in People v. Croswell.  To stake out the position that the law is solely the court's province, and that it is the jury's duty to apply the law as the Court gives it to the jury is at tension with the Supreme Court's direction that it is the jurors' "right to take upon yourselves to judge . . . both . . . the law as well as the fact in controversy," Georgia v. Brailsford, 3 U.S. at 4 (emphasis added), and that, when, in the jurors' eyes, "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law, People v. Croswell, 3 Johns. Cas. at 355-56.  The question thus becomes whether this judicial power infringes on the province of the jury.

Similar to the modern-day jury's lack of knowledge about sentencing information, it may be that any lack of the jury's knowledge about its nullification power does not implicate the Sixth Amendment's jury trial right, because even if the jurors' knowledge about nullification has receded, the jury's power to nullify still exists to the same extent that it did in the Founders' time. As the Honorable Learned Hand observed in Steckler v. United States, 7 F.2d 59 (2d Cir. 1925), however inconsistent jury nullification may be with the jury's role as factfinder and duty to apply the law as given to its findings of fact, the jury retains this nullification power and exercises this

power when the jury sees fit to do so regardless whether the court informs the jury about the power:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

7 F.2d at 60.

The Supreme Court and especially the Tenth Circuit have also concluded that this change in practice -- to affirmatively instruct the jury to follow the law which the district court gives to it -- has not unconstitutionally eroded the jury's role from the Founders' conception of the jury's role. This conclusion finds support in the policy considerations which Justice Harlan pointed out in Sparf v. United States.   Justice Harlan noted that many of the concerns present in England and the colonies in the Framers' era about the injustice that stems from judges as arms of the oppressive state dissipated with the requirements in the United States that judges give their opinions publicly, explaining the reasoning behind their opinions therein, and the repercussion of impeachment guaranteed in the United States Constitution:

> As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to the purposes of injustice.

156 U.S. at 107 (quoting United States v. Morris, 1 Curt. at 63).   He reasoned, rather, that placing the duty to expound the law in the courts and requiring the citizens to follow them furthers the interests of justice by helping to ensure that laws which the democratic government enacts are enforced regardless of their popularity:

> I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen.  The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy.  But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne.

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt. at 63).   As Justice Weinstein notes, Sparf v. United States produces a court system that can efficiently deal with the realities of the organic evolution of the American legal system and the jury pool:

> Justice Harlan's majority opinion was well designed to produce a more efficient court system calculated to deal with the growing complexity of the law; the much improved training and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's details; and a desire to provide predictable rules protecting our growing national industry and commerce.

United States v. Polizzi, 549 F. Supp. 2d at 421.   Thus, these courts have been very clear about what a trial court should do when asked to inform the jury about its nullification power, or allow the lawyers to do so: "'[N]either the court nor counsel should encourage jurors to violate their oath.'"   United States v. Gonzalez, 596 F.3d at 1237 (quoting United States v. Trujillo, 714 F.2d at 106).   See United States v. Gonzalez, 596 F.3d at 1237 ("[W]e disapprove of the encouragement of jury nullification.").

The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism.   That the jurors' lack of knowledge stems at least in part from the judicial exertion of power, and that the jury's nullification power played an important role in criminal jury trials at the Founders' time, counsels in favor of finding this evolution unconstitutional.   In Blakely v. Washington, the State of Washington asserted that, although the jury did not find the aggravating fact supporting the enhancement that the sentencing

judge applied, and the sentencing range based on the facts submitted to the jury corresponded with a 49 to 53-month range, the 90-month sentence imposed was nevertheless constitutional, because the statutory maximum for the crime was 10-years, and the sentence imposed was under that statutory maximum.  See 542 U.S. at 303.  Justice Scalia pointed out, however, that "[o]ur precedents make clear that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict . . . ," 542 U.S. at 303 (emphasis omitted), noting that, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority," 542 U.S. at 304 (internal citations omitted).  Justice Scalia explained that Apprendi v. New Jersey and its progeny are based on the commitment to the Framers' intention in providing the Sixth Amendment jury trial right: the people's ultimate control in the judiciary.

> Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial.  That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.  Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.  See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti–Federalist 315, 320 (H. Storing ed. 1981)(describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850)("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958)("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-48 . . . (1999).  Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict.  Without that restriction, the jury would not exercise the control that the Framers intended.

Blakely v. Washington, 542 U.S. at 305-06.   To take away the defendant's ability to inform the contemporary jury about its nullification power, which was central to the common-law jury's role in ensuring that the people kept "ultimate control . . . in the judiciary," 542 U.S. at 306, effectively takes away the modern jury's ability to withhold a guilty verdict where it believes to do so is just. This situation is particularly the case when a court instructs the jury that it must follow the court's instructions on the law, and set aside any beliefs it may have about what the law should be.   In such a case, because the jury did "not exercise the control that the Framers intended," the sentence that the court subsequently imposes on the defendant does not "derive[] wholly from the jury's verdict," as the Framers contemplated "jury," and thus violates the Framers' intent in preserving the jury trial right in the Sixth Amendment.   Blakely v. Washington, 542 U.S. at 305-06.

Because the common-law jury at the Founders' time was in control of the judiciary by virtue of rendering the ultimate decision in its verdict, and because the court at the time of the Founders told the jury that the jury was the master of the law and of the facts, the Supreme Court and the Tenth Circuit's precedent that the trial court should not instruct the jury about nullification seems inconsistent with the Framers' intention in adopting the Sixth Amendment jury trial right. Moreover, the requirement that the court not allow the lawyers to encourage nullification is inconsistent with the practice at the time of the Framers, as exhibited by Hamilton's conduct in People v. Croswell.   While it is messy to openly talk to the jury about jury nullification in the modern American judicial system, the Constitution, thank goodness, is not always about efficiently convicting defendants.

Courtney's case is an example of why the law should allow a party to secure a nullification instruction and the opportunity to argue openly for the jury to nullify.   To date, the Court has been

able to discern little factual or legal defense.   If the Court does not give Courtney the ability to ask

the jury to nullify, he has little defense.   Courtney's case arises out of the 2007-2008 financial

collapse, which has also been referred to as the Great Recession, which the Court has previously

noted had a negative impact on real-estate values nationwide, including in New Mexico, and

which caught off-guard even the "leading economists in the United States."   United States v.

Garcia, No. CR 10-1727 JB, Memorandum Opinion and Order at 94 (D.N.M. Mar. 22,

2013)(Browning, J.).   As the Court noted in United States v. Garcia, "[w]hile it is never a good

idea to engage in fraudulent investments, the unlikely investors which invest in a bust should not

be saddled with all of the industries' losses."   United States v. Garcia, slip op. at 95.   Hamilton

argued in People v. Croswell that the jury's role includes finding against the law if it believes

criminal liability for printing an article critical of the President of the United States is

unconscionable; so here, Courtney perhaps should be afforded the opportunity to have the Court

instruct the jury, or his counsel be allowed to tell the jury, that, if it finds "the law arising in the

case is different from that which the court advances," the jurors are "bound by their oaths, by their

duty to their creator and themselves, to pronounce according to their own convictions," rather than

according to the dictates of the law.   People v. Croswell, 3 Johns. Cas. at 355-56.   Nevertheless,

because controlling Tenth Circuit precedent does not allow the Court or the counsel to engage the

jury in discussion about jury nullification, and because the district court is obligated to follow

controlling Supreme Court and Tenth Circuit precedent, the Court will deny Courtney's request to

instruct the jury about its mitigation or nullification power.   See, e.g., Zamora v. Wells Fargo

Home Mortg., 831 F. Supp. 2d at 1305 ("While the Court realizes that its decision . . . may in some

ways be unfair and unduly harsh . . . , the Court is bound to follow binding precedent from the Tenth Circuit.").

III.  **BECAUSE THE SUPREME COURT'S AND TENTH CIRCUIT'S INTERPRETATIONS OF THE SIXTH AMENDMENT JURY TRIAL RIGHT DO NOT ALLOW FOR THE COURT TO PROVIDE THE JURORS INSTRUCTIONS ABOUT SENTENCING RAMIFICATIONS OR JURY NULLIFICATION, THE COURT WILL FOLLOW TENTH CIRCUIT PRECEDENT AND WILL DENY COURTNEY'S REQUEST TO INSTRUCT THE JURY ABOUT THE SENTENCING GUIDELINES ADVISORY SENTENCING PROVISIONS AND ABOUT THE JURY'S NULLIFICATION POWER.**

Courtney asks the Court to provide a modified Tenth Circuit Pattern Instruction Criminal § 1.04, which, unmodified, generally instructs jurors that it is their duty to apply the law that the Court gives to them, without consideration of their notions as to what the law should be or possible penalties to the defendant.   The Court concludes that the modified jury instruction is consistent with both the Tenth Circuit's and Supreme Court's positions on instructing the jurors about their role and their duties.   While the Court believes that these positions are inconsistent with the Framers' intent in ratifying the Sixth Amendment jury trial right, the Court will deny Courtney's request to provide the requested instruction.

Although Courtney in his Motion largely focuses his energy and the Court's attention on the request that the Court "permit the jury to be informed of the Guideline advisory sentencing provisions at any trial in this matter," Motion at 1, he appears to have largely abandoned, at the hearing and afterwards, the request to instruct the jury on sentencing ramifications in favor of focusing on providing the jury information about their nullification power.   This shift of focus is evinced from the instruction he provides to the Court in his Defendant's Proposed Instruction, submitted after the Court requested that he submit to the Court an example of the instructions he intends to request at trial.   See Tr. at 42:22-43:6 (Court, Linnenburger); Courtney's Proposed

- 74 -

Instruction at 2.   In regard to jury nullification, he specifically asks the Court to modify the Tenth

Circuit Pattern Instructions (Criminal) § 1.04 by striking the text and adding the bracketed text as

follows:

> You, as jurors, are the judges of the facts. But in determining what actually happened -- that is, in reaching your decision as to the facts -- it is your sworn duty to follow all of the rules of law as I explain them to you [**unless you are left with a firm belief that application of those rules in this case would be fundamentally unjust**].

> ~~You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However,~~ [Y]ou should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

> It is also your duty to base your verdict ~~solely upon the evidence~~, without prejudice ~~or sympathy~~. That was the promise you made and the oath you took.

> [**If you determine the facts do not prove guilt beyond a reasonable doubt, you must enter a verdict of not guilty. If you determine the facts do prove guilt beyond a reasonable doubt, you should enter a verdict of guilty unless you have a firm belief that a conviction would be fundamentally unjust.**]

Courtney's Proposed Instruction at 2 (modifying Tenth Circuit Pattern Instructions (Criminal) §

1.04).   The Court concludes that, pursuant to Supreme Court and Tenth Circuit precedent,

providing this instruction to the jury is improper.

The only reference to the ramifications of a guilty verdict in the pattern instruction which

Courtney seeks to strike from his instruction to the jury is that "[i]t is your duty to apply the law as

I explain it to you, regardless of the consequences."   Courtney does not ask, therefore, to inform

the jury about the possible Sentencing Guidelines range to which he would be subject if convicted,

but rather appears to request only that the Court not instruct the jurors to disregard these

consequences.   Thus, regardless whether the Sixth Amendment jury trial right includes the jury's right to know about the possible sentencing ramifications of their guilt, Courtney does not seek to exercise any such right.   His request about the verdict's consequences thus may be better classified as a request to instruct the jury about its nullification power.

In relation to the jury's nullification power, Courtney seeks generally two things: (i) to impliedly inform the jury about its power to nullify, by instructing it that it need not follow the law if the jurors "are left with a firm belief that application [of law that the Court gives] in this case would be fundamentally unjust;" and (ii) to preclude the Court from instructing the jurors that they are to faithfully apply the law the Court give to them, regardless of their conceptions about what should be the law or about the possible consequences.   The common-law jury knew about its ability to nullify -- knew that it had the ability to acquit the defendant or mitigate the verdict regardless whether the evidence proved beyond a reasonable doubt the fact that the defendant was guilty -- and the court informed the jury at the Founders' time that its role included acting as the final arbiter of law.   At the Framers' time, a jury's exercise of its nullification power would have been considered a proper exercise of its duty.   The Supreme Court in Sparf v. United States appears to have considered whether such a position was efficient and announced that "[the jury cannot] rightfully refuse to act upon the principles of law announced by the court."   156 U.S. at 90.   The Court concludes that, while a defendant's Sixth Amendment jury trial right includes both the right to instruct the jury about the nullification power, and to allow his or her counsel argue for nullification, it must follow the Tenth Circuit's directions not to instruct the jury about this power. See United States v. Rith, 164 F.3d at 1337 ("[T]he law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable

doubt, disregard the law."); United States v. Thomas, 116 F.3d at 615 ("[T]he powers of the jury to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent.").   At a minimum, it appears that the Court should not be lying to or misleading the jury -- telling the jurors that they do not have the power to nullify or mitigate -- when in fact the jury does have that that power. Nevertheless, because of controlling precedent, the Court will deny Courtney's request to qualify its instruction to the jury about faithfully applying the law that the Court gives to it by inviting them not to do so if they "are left with a firm belief that application [of the law] in this case would be fundamentally unjust."   Courtney's Proposed Instruction at 2.

Courtney's second request is that the Court withhold instructing the jury that it is not "to question the wisdom or correctness of any rule I may state to you," and that the jury "must not substitute or follow your own notion or opinion as to what the law is or ought to be."   Tenth Circuit Pattern Instructions (Criminal) § 1.04.   The Tenth Circuit's language is consistent with Sparf v. United States; Justice Harlan in Sparf v. United States holds that it is not unconstitutional to instruct the jury that the court gives it the law and that it is the jury's duty to apply the law as the Court gives it.   Sparf v. United States does not, however, appear to go as far as to stand for the proposition that district courts should instruct the juries that they are not to question the wisdom or correctness of any rule the court gives them, or to totally discount their opinion of what the law should be in their conscience.   Tenth Circuit law therefore appears to go beyond what Sparf v. United States requires.

Sparf v. United States has been settled law for over one-hundred years, as it was decided in 1895.   Since that time, the Supreme Court has not called its holding into question, and neither

party has supplied, nor has the Court in its research found an appellate case finding error in a court instructing the jury to follow Sparf v. United States' instruction of the law.   This phrase has existed in its current language in the Tenth Circuit Pattern Instructions (Criminal) since 2005, has not been altered, and has not been called into question in the Circuit.   While this language goes beyond Sparf v. United States in instructing the jury that it is not to call into question whether the law in the case is fundamentally unjust, the language does not go as far as to instruct the jury that it must disregard its conscience in deciding the verdict, or that, if the government proves its case beyond a reasonable doubt, that the jury has no power to do anything but find the defendant guilty. Thus, although the recent Supreme Court case law discussing the Sixth Amendment jury trial right calls into question the language in this instruction, the Court cannot say that the Supreme Court has effectively ruled this instruction unconstitutional.   The Tenth Circuit or Supreme Court will have to say the law has changed.   While the Court believes that this instruction violates Courtney's jury trial rights as the Framers' intended to preserve them in the Sixth Amendment, the Court must defer to the Supreme Court's guidance to district courts that, where a recent decision casts doubt about the precedential value of Supreme Court case law, district courts must adhere to the established precedent until the Supreme Court explicitly reconsiders it.   See Hohn v. United States, 524 U.S 236, 252-53 (1998)("[O]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued validity.").   Accordingly, given the Supreme Court's upholding of the district court's refusal to instruct the jury about the ramifications of a verdict of not guilty by reason of insanity in Shannon v. United States, given the Supreme Court's holding that the jury's duty is to take the law the court gives it, given the offenses at issue in this case do not require jury participation in sentencing, and

given that the Tenth Circuit Pattern Jury Instruction (Criminal) § 1.04's language does not clearly infringe Courtney's Sixth Amendment jury trial right as the Tenth Circuit and Supreme Court have construed that right, the Court will not provide to the jury Courtney's requested instruction.

**IT IS ORDERED** that the Defendant Courtney's Motion to Preserve Right to Jury Trial, filed March 29, 2012 (Doc. 31), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
    Unites States Attorney
Mary L. Higgins
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Billy R. Blackburn
Paul Linnenburger
Albuquerque, New Mexico

    *Attorneys for the Defendant*