**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                         No. CR 11-2860-001 JB

KEITH MICHAEL COURTNEY,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Objections to August 28, 2013 Redisclosed Presentence Investigation Report, filed October 2, 2013 (Doc. 151)("Objections"); (ii) the Sentencing Memorandum of Keith Michael Courtney, filed October 3, 2013 (Doc. 152)("Sentencing Memo."); and (iii) the Letter from Keith Michael Courtney to the Court, filed October 9, 2013 (Doc. 156)("Courtney Letter"). The Court held a hearing on October 9, 2013. The primary issues are: (i) whether Defendant Keith Michael Courtney was an organizer of criminal activity, thus triggering a 2-level increase under U.S.S.G. § 3B1.1(c); (ii) whether Courtney used a special skill to commit his crimes, thus triggering a 2-level increase under U.S.S.G. § 3B1.3; (iii) whether Courtney used sophisticated means to commit wire fraud, thus triggering a 2-level increase under U.S.S.G. § 2B1.1(b)(10)(C); (iv) whether Courtney has clearly demonstrated acceptance of responsibility for his offense, thus triggering a 2-level decrease under U.S.S.G. § 3E1.1(a); and (v) whether the Court should vary Courtney's sentence from the Guidelines sentencing range. The Court concludes that Courtney was an organizer of the fraud scheme, that he used sophisticated means to commit wire fraud, and that he has not clearly demonstrated acceptance of responsibility for his offense; the Court

cannot properly apply a special-skill enhancement, because such an enhancement cannot be imposed in conjunction with an aggravating role enhancement, which Courtney merits. Courtney's total offense level is thus 25, and his criminal history category is I, indicating a Guidelines sentencing range of 57-71 months. The Court will vary downward from this range, however, and impose a sentence of 24-months imprisonment; the Court will also impose three years of supervised release. The Court, thus, sustains the Objections in part and overrules them in part, and grants in part and denies in part the relief that the Sentencing Memo. and the Courtney Letter request.

## **FACTUAL BACKGROUND**

From approximately November, 2006, to September, 2007, Courtney and Co-Defendant Jason Johns operated an elaborate scheme to fraudulently obtain money from mortgage lending institutions. See Second Amended Presentence Investigation Report ¶ 32, at 12 (disclosed August 28, 2013)("PSR"). Courtney was part-owner of construction and mortgage/lending companies, and Johns was one of Courtney's loan officers. See PSR ¶ 32, at 12. The scheme involved using straw buyers to purchase two houses that Courtney had built and that Courtney's mother owned; Johns used his knowledge as a loan officer to generate the loan applications, secure no-document loans, obtain the straw buyers' signatures, and submit the applications to prospective lenders. See PSR ¶ 32, at 12. Courtney used his knowledge as the part-owner of the businesses and made the transactions possible by acting as the real estate broker for the buyers, signing the closing documents on behalf of his mother under a power of attorney. See PSR ¶ 32, at 12. Courtney also promised to pay the mortgages on both homes on behalf of the straw buyers. See PSR ¶ 32, at 12.

Courtney and Johns solicited a total of $1,601,825.80 in fraudulent loans, of which $772,265.17 they never repaid.  See PSR ¶ 33, at 12.  Courtney appears to have intended to pay off all the loans, but his businesses went south and, on September 11, 2008, Courtney declared Chapter 13 bankruptcy.[1]  See PSR ¶ 33, at 12.  Courtney recruited others into his scheme -- including the straw buyers and his mother -- but, other than Johns, their level of knowledge of and culpability for the fraud remains unestablished.  See PSR ¶ 33, at 12.

## PROCEDURAL BACKGROUND

A jury convicted Courtney of Wire Fraud and Aiding and Abetting under 18 U.S.C. § 1343 and 18 U.S.C. § 2.  See Indictment, filed November 9, 2011 (Doc. 2); Verdict, filed March 27, 2013 (Doc. 109).  The United States Probation Office ("USPO") disclosed the PSR on August 28, 2013.[2]  The USPO calculates the base offense level to be 7 pursuant to U.S.S.G. § 2B1.1.  See PSR ¶ 44, at 7.  The USPO applies a 14-level increase pursuant to U.S.S.G. § 2b1.1(b)(1)(H), because the total loss amount for which Courtney is responsible is $772,265.17.  See PSR ¶ 45, at 15.  The USPO also applies a 2-level increase pursuant to U.S.S.G. 2b1.1(b)(10) for use of sophisticated means, because the case involved an elaborate mortgage-fraud scheme, which, the USPO contends, constitutes the use of sophisticated means. See PSR ¶ 46, at 15.  The USPO additionally applies a 2-level increase pursuant to U.S.S.G. § 3B1.1 for his role in the offense, because Courtney was a part-owner of three companies involved in the scheme, because he recruited the straw buyers upon which the scheme depended

---

[1]Chapter 13 bankruptcy is reorganization bankruptcy, see 11 U.S.C. Ch. 13, which is distinguished from liquidation, or straight, bankruptcy, see 11 U.S.C. Ch. 7.

[2]The USPO disclosed two prior versions of the PSR, see Presentence Investigation Report (disclosed July 9, 2013); Presentence Investigation Report (disclosed August 12, 2013), but, as the USPO disclosed the final PSR before any of the parties' objections or briefing on sentencing, the Court will not explain how and why the final PSR differs from the two prior versions.

and acted as their point of contact, and because Courtney's mother used the loan proceeds to pay off her own mortgage and construction loans.  See PSR ¶ 48, at 15.  The USPO last applies a 2-level adjustment for use of a special skill, because Courtney used his knowledge as part-owner of mortgage/lending companies, and because he acted as a real estate broker for the buyers, signing the closing documents on his mother's behalf under a power of attorney and directing the proceeds.  See PSR ¶ 49, at 15.  The USPO explicitly recommends that the Court not apply a reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility.  See PSR ¶ 53, at 16.  Taken together, the PSR calculates Courtney's total offense level to be 27.  See PSR ¶ 54, at 16.  The PSR calculates his criminal history to be I, based on a total of zero criminal history points.  See PSR ¶ 58, at 16.  A total offense level of 27 and criminal-history category of I produces a Guideline imprisonment range of 70-87 months.  See PSR ¶ 87, at 23.

In his Objections, Courtney objects to the PSR's statements that he was a real estate broker for the buyers, arguing that he was a broker only for his mother, the seller.  See Objections at 2.  Further, Courtney objects to the PSR's special-skills enhancement, arguing that he did not use any special skills as a real estate broker to significantly facilitate the alleged crimes, and, further, that he cannot receive both the special-skills enhancement and the aggravating role enhancement.  See Objections at 3-12.  Courtney also objects to the PSR's application of the sophisticated means enhancement, arguing that mortgage schemes that would justify application of that enhancement are far more complex than those in this case.  See Objections at 12-17.  In his view, "there must be something more intricate and complex than the mere commission of the crime at issue to warrant the enhancement."  Objections at 13.  As an example, Courtney cites United States v. Weiss, 630 F.3d 1263 (10th Cir. 2010); in that case, the Tenth Circuit upheld the district court's application of the sophisticated means enhancement

where the defendant had engaged in complex financial calculations and generated multiple false credit letters to fraudulently obtain loans for ineligible buyers under the Fair Housing Act.  See United States v. Weiss, 630 F.3d at 1267-68, 1278-19.  Citing United States v. Weiss and cases like it, Courtney argues that, because the Tenth Circuit has upheld application of the sophisticated means enhancement to schemes arguably more complex than the ones he used, the Court should not apply the enhancement here; according to him, the allegations here "do not evidence the level of deceit and calculated action that the Tenth Circuit and others have pointed to as sufficient to substantiate the Sophisticated Means enhancement."  Objections at 14-17.

Courtney also objects to the PSR's application of the aggravating role enhancement.  See Objections at 18-22.  Courtney first points out that the PSR does not specify which of the four aggravating roles listed in U.S.S.G. § 3B1.1 he played and suggests that that alone should cause the Court to deny the enhancement, citing no authority for that proposition.  See Objections at 19.  To the substance of the enhancement, Courtney argues that the Tenth Circuit has interpreted "leader" in U.S.S.G. § 3B1.1 to require a degree of control over others.  Objections at 18-19.  In Courtney's view, there is no evidence that he exercised the degree of control required, and, further, he points to Johns' role in "recruiting the borrowers; preparing and submitting loan applications, and closing the loans," and argues that Courtney's conduct was less significant than Johns'.  Objections at 19-21.  Further, Courtney argues that, even assuming the PSR's characterization of Courtney's involvement, "[t]here simply is no evidence that Mr. Courtney did anything extraordinary beyond his actions to 'facilitate' the mortgage transactions."  Objections at 22.  He submits that, "[c]omparing the evidence regarding John's actions in the mortgage transactions with the evidence regarding Mr. Courtney's makes clear that Mr. Courtney did not act as a leader or organizer."  Objections at 22.

The United States responded to each of these arguments.  See United States' Response to Defendant's Objections to August 28, 2013, Redisclosed Presentence Report (Doc. 151), filed October 8, 2013 (Doc. 154)("U.S. Response to Objections").  With respect to the sophisticated means enhancement, the United States argues that Courtney, along with Johns, used fraudulent no-documentation loans to mislead mortgage lenders, misrepresenting to them that the straw buyers were buying the houses as primary residences -- and that he did this to pay off existing loans in his mother's name.  See U.S. Response to Objections at 5-6.  Further, he concealed that he was the true source of the mortgage payments using a wire transfer and a cashier's check.  See U.S. Response to Objections at 6.  The United States concedes that, when Courtney became unable to continue paying those payments, he acceded to the buyers' request that he draft letters indicating he was responsible for making their mortgage payments -- but contends that he did so fully aware that those letters would have no legal effect on the straw buyers' existing obligations, and, further, that the letters also could not help the lenders address the underlying fraud.  See Response at 7.  Given these allegations, the United States says, the Court should read the cases that Courtney cites in light of an important qualification that permeates Tenth Circuit sophisticated means cases: that the enhancement can apply even if individual steps were unsophisticated, so long as the overall scheme was sophisticated.  See U.S. Response to Objections at 7.  In the United States' view,

> [Courtney's] overall scheme involved using [his] companies to obtain appraisals in excess of the underlying construction loans, enlisting straw buyers to sign the loan applications, obtaining no-documentation loans allegedly for the purchase of primary residences, concealing that the associated costs paid to the title companies came from Courtney, all in order to divert the sales proceeds to Courtney's benefit.  Courtney's subsequent payment of the mortgages extended the concealment of the fraud.  These actions are sufficient for the application of the enhancement for use of sophisticated means.

U.S Response to Objections at 8.

With respect to the aggravating role enhancement, the United States first argues that, as the background to § 3B1.1 says,

> [i]n relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility.  This is reflected in the inclusiveness of §3B1.1(c).

U.S. Response to Objections at 11 (quoting U.S.S.G. § 3B1.1).  The United States clarifies that it seeks the enhancement, because Courtney was an organizer, rather than a leader.  See U.S. Response to Objections at 11-12.  The United States argues that, under Tenth Circuit law, it does not need to prove that Courtney controlled others: "Rather, to qualify as an organizer, a defendant 'need only devise a criminal scheme providing the wherewithal to accomplish the criminal objective, and coordinate and oversee the implementation of the conspiracy, even though the defendant may not have any hierarchical control over the other participants.'"  U.S. Response to Objections at 12 (quoting United States v. Wardell, 591 F.3d 1279 (10th Cir. 2009)(internal quotation omitted)).  Citing the factors listed in U.S.S.G. § 3B1.1 cmt. 4, the United States alleges that Courtney held a fifty-percent ownership interest in all three companies involved, while Johns was only an employee.[3]  See U.S. Response to Objections at 12.  Further, the United States contends that, because Courtney's mother owned the properties sold, he had the authority to sell the houses to the straw buyers.  See U.S. Response to Objections at 12.  The United States also argues that, because Courtney convinced straw buyers to participate,

---

[3]At the hearing, Courtney clarified that Johns was an independent contractor, and not an employee.  See Transcript of Hearing at 29:25-30:8 (taken October 9, 2013)("Tr.")(the Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final version may contain slightly different page and/or line numbers)(Court, Wisenberg).  The Court is not aware of any reason this distinction makes a difference, and the United States concurred in that view.  See Tr. at 30:25-31:12 (Higgins).

authorized the sale of the houses, and paid all associated costs, "[t]he transactions could not have occurred without his participation," and, further, that "Courtney had the largest share of the 'fruits of the crime.'" U.S. Response to Objections at 12. The United States contends that, contrary to Courtney's characterization of Johns, "Johns had no authority to proceed on his own," because "ultimate control and authority over the transactions lay with Courtney." U.S. Response to Objections at 12. In particular, the United States notes that Courtney was vital to recruiting the straw buyers, because he "assured the straw buyers that he would make the mortgage payments, which they relied on because they knew Johns had no funds." U.S. Response to Objections at 13. The United States concedes that Johns signed a promissory note that Courtney did not, but argues that Courtney paid that promissory note and that Johns lacked any funds to pay it. See U.S. Response to Objections at 13. In sum, the United States argues, Courtney is an "organizer" of criminal activity, and thus the Court should enhance his sentence by two levels. U.S. Response to Objections at 13.

With respect to acceptance of responsibility, the United States contends that Courtney bears the burden to prove by a preponderance of the evidence that he is entitled to the acceptance-of-responsibility reduction and that he has not met that burden. See U.S. Response to Objections at 13-15. The United States concedes that, by going to trial, the law does not absolutely bar Courtney from arguing that he accepted responsibility. See U.S. Response to Objections at 13-14. The United States argues, however, that, by denying that he had the intent to defraud, he challenged a necessary, factual element of proof, and that he has not, therefore, clearly demonstrated that he accepts responsibility for his conduct. See U.S. Response to Objections at 14-15. The United States argues that, under the Guidelines, this argument "does not comprise one of the rare situations in which the [acceptance-of-responsibility] reduction may

be available" when a defendant goes to trial.  U.S. Response to Objections at 15.  Therefore, the United States contends, "Courtney simply has not demonstrated any acceptance of guilt or responsibility, and is not eligible for a two-level reduction for acceptance of responsibility." U.S. Response to Objections at 15.  Last, the United States presents argument supporting the special-skills enhancement, but argues that the Court should not apply both the special-skills enhancement and the aggravating role enhancement.  See U.S. Response to Objections at 8-11. The Court's decision, explained below, to apply the aggravating role enhancement renders these arguments moot.

The USPO responded to Courtney's Objections and the U.S. Response to Objections by conceding that the special-skill enhancement cannot be applied along with the aggravating role enhancement, but otherwise defending the PSR's conclusions and recommendations.  See Addendum to the Second Redisclosed Presentence Report at 1, disclosed October 7, 2013 ("PSR Addendum").  This amendment results in a total offense level of 25, instead of 27, and thus indicates a Guidelines sentencing range of 57-71 months.  The USPO also amends PSR ¶¶ 10, 32, and 49, to reflect that Courtney acted as real estate broker only for his mother.  See PSR Addendum at 1.

A day after filing the Objections, Courtney filed the Sentencing Memo.  While the Objections focus on Guidelines arguments -- specifically, arguing against the PSR's recommendations -- the Sentencing Memo. primarily advances extra-Guidelines § 3553(a) arguments.  The Sentencing Memo. attaches a number of letters from various individuals attesting to Courtney's high character.  See Letter from Ron Courtney to the Court, filed October 3, 2013 (Doc. 152-2 at 1-4)(Courtney's father); Letter from Wendy Courtney to the Court, filed October 3, 2013 (Doc. 152-2 at 5-6)(Courtney's mother); Letter from Kena Fedorschak to the

Court, filed October 3, 2013 (Doc. 152-2 at 7)(mentee); Letter from Delilah Medina to the Court, filed October 3, 2013 (Doc. 152-2 at 8)(friend); Letter from Robert Messenger to the Court, filed October 3, 2013 (Doc. 152-2 at 9)(fellow volunteer); Letter from Jason Wyrick to the Court, filed October 3, 2013 (Doc. 152-2 at 10)(friend); Letter from Mohammed Islam to the Court, filed October 3, 2013 (Doc. 152-3 at 1)(friend and colleague); Letter from Phyllis Seamster to the Court, filed October 3, 2013 (Doc. 152-3 at 2)(friend); Letter from Kelly Ryan to the Court, filed October 3, 2013 (Doc. 152-3 at 3-4)(colleague); Letter from Kimberly Jendrick to the Court, filed October 3, 2013 (Doc. 152-3 at 5-6)(friend); Letter from John Barron to the Court, filed October 3, 2013 (Doc. 152-3 at 7-8)(friend and colleague); Letter from Sean McQueeney to the Court, filed October 3, 2013 (Doc. 152-3 at 9); Letter from Carlos Alvarez to the Court, filed October 3, 2013 (Doc. 152-4 at 1)(friend); Letter from Daniel Hill to the Court, filed October 3, 2013 (Doc. 152-4 at 2-3)(friend and mentee); Letter from Gia Venturi to the Court, filed October 3, 2013 (Doc. 152-4 at 4)(former employee); Letter from Ella Fenoglio to the Court, filed October 3, 2013 (Doc. 152-4 at 5-6)(family friend); Letter from Phillip Rand to the Court, filed October 3, 2013 (Doc. 152-4 at 7-8)(colleague); Letter from Janis Bookout to the Court, filed October 3, 2013 (Doc. 152-4 at 9)(colleague); Letter from John Mihelic to the Court, filed October 3, 2013 (Doc. 152-5 at 1)(colleague); Letter from Kevin Lambe to the Court, filed October 3, 2013 (Doc. 152-5 at 2)(professional contact); Letter from Mattie Morris to the Court, filed October 3, 2013 (Doc. 152-5 at 3)(colleague); Letter from Sarah Marshall to the Court, filed October 3, 2013 (Doc. 152-5 at 4-6)(friend and colleague); Letter from Gina DuVall to the Court, filed October 3, 2013 (Doc. 152-5 at 7-8)(fellow volunteer); Letter from Toni Allen to the Court, filed October 3, 2013 (Doc. 152-5 at 9-11)(girlfriend).  The Sentencing Memo. elaborates upon many of the same things upon which the attached letters touch, including Courtney's work

with Landmark Worldwide.  <u>See</u> Sentencing Memo. at 12-16.  Landmark Worldwide is an apparently much-lauded group that "offers seminars and courses aimed at helping individuals with personal and professional growth, training and development . . . [for] more than 2.2 million people . . . [while operating from] 115 locations across more than 20 countries."  Sentencing Memo. at 13-14.  The Sentencing Memo. also summarizes the content of the various attached letters.  <u>See</u> Sentencing Memo. at 16-34.

In addition to its general assertion that Courtney's exemplary character merits consideration under § 3553(a), the Sentencing Memo. advances three more specific arguments that the Court should vary on the basis of Courtney's character.  <u>See</u> Sentencing Memo. at 35-36. First, Courtney argues that this crime was first-time, atypical conduct, and that, "[w]hile repetitious or planned behavior does not qualify for an aberrant conduct downward departure under the Guidelines regime, the Court is free to reject this Guidelines restriction and consider the atypical nature of Mike's conduct when deciding whether to downwardly vary."  Sentencing Memo. at 35.  Second, Courtney argues that the Court should vary downward on the grounds of the strong support he provides to both his family and his community; essentially, Courtney argues that society -- and Courtney's family in particular -- benefits from Courtney being out of prison.  <u>See</u> Sentencing Memo. at 35-36.  Third, Courtney contends that his strong employment history militates against imposing a prison sentence, asserting that other courts have varied downward on this basis.  <u>See</u> Sentencing Memo. at 36 (citing <u>United States v. Ruff</u>, 535 F.3d 999, 1001 (9th Cir. 2008)).

Courtney also attaches a table of cases in which district courts have imposed sentences significantly below the Guidelines range on defendants convicted of fraud.[4]  See Sentencing Memo. at 48-52.  Courtney argues that these sentences are relevant in this case primarily under 18 U.S.C. § 3553(a)(6), which directs courts to consider the "'need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"   Sentencing Memo. at 41. Courtney also argues that the United States Sentencing Commission erred by dramatically increasing sentences for fraud when the fraud involves a large amount of money.  See Sentencing Memo. at 53-58.  Courtney's argument on this front is two-fold: (i) he asserts that increases in sentence severity do little, if anything, to deter future criminality, see Sentencing Memo. at 53-55 (citing, e.g., David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995)); and (ii) he argues that "the large number of specific offense characteristics under § 2B1.1 are cumulative and fail to accurately reflect the seriousness of the offense," i.e., that the increasing number of aggravating factors -- from six in the original Guidelines to "nearly thirty" today -- represents a "'factor creep'" wherein the factors overlap to such an extent that they no longer produce just, consistent sentences, but, rather, pile on excessive additional offense levels for no other reason than that the factors, each viewed in isolation, seem like they represent sinister conduct, see Sentencing Memo. at 56, 55-58.  Last, Courtney argues that his victims deserve restitution, and that, the sooner he is released from prison, the sooner he can earn money to pay restitution.  See Sentencing Memo. at 58 (citing

---

[4]At the hearing, Courtney noted that this table is not "scientific at all," but rather "an example [of] some high profile, and . . . some lower profile cases of sentencing courts just simply refusing to follow the Guidelines, and giving very significant downward variances." Transcript of Hearing at 72:20-24 (taken October 9, 2013)(Wisenberg).

18 U.S.C. § 3553(a)(7)).  The Sentencing Memo. also attached a report from the National Center on Institutions and Alternatives, Inc. ("NCIA"), which analyzes Courtney's offense against the NCIA's database of prior crimes and sentencing outcomes.  Federal Sentencing Statistical Analysis Report, filed October 3, 2013 (Docs. 152-8 & 152-9)[5]("NCIA Report").  The NCIA Report indicates that the average defendant sentenced under 18 U.S.C. § 1343 in the Tenth Circuit, in Courtney's "loss amount" category -- $400,000.00 to $1,000,000.00 -- is sentenced to 24.4-months imprisonment, see NCIA Report at 6 n.2, or 26.1-months imprisonment, if probation-only sentences are excluded, see NCIA Report at 6.

The United States responded to the Sentencing Memo. separately from its response to the Objections.  See United States' Response to Sentencing Memorandum of Keith Michael Courtney (Doc. 152) at 1-6, filed October 8, 2013 (Doc. 155)("U.S. Response to Memo.").  The United States clarifies that it opposes a probation-only sentence, see U.S. Response to Memo. at 1, and attempts to rebut several of the mitigating factors that the Sentencing Memo. raises, see U.S. Response to Memo. at 2-6.  First, however, they argue that the Court should not view Courtney's mortgage payments on behalf of the straw buyers, and his subsequent letter to the lenders when he was no longer able to make payments, as acceptance of responsibility for Guidelines purposes.  See U.S. Response to Memo. at 3.  The United States says that these actions were "the only way he could delay detection of the fraud."  U.S. Response to Memo. at 3.

---

[5]Courtney actually attaches two NCIA Reports to his Sentencing Memo.; the first includes in its data sets all defendants -- including those who received a downward departure pursuant to U.S.S.G. § 5K1.1 -- while the second report excludes defendants who received § 5K1.1 departures.  As Courtney has not been offered, argued for, or received a § 5K1.1 downward departure, the Court will refer only to the second one, Document No. 152-9, when it refers to the NCIA Report.

The United States next acknowledges the ream of letters written on Courtney's behalf and attached to the Sentencing Memo., but asks the Court to remember the victims:

> Without taking anything away from what these persons say the Defendant has done for them, it should be noted he did not show the same care or concern for the straw buyers.  His motive in engaging in the fraudulent transactions was to sell two houses and raise money for his own uses, and certainly not to help them. More importantly, there are no letters from any persons whom he or his three companies represented in real estate transactions, or from whom he borrowed over $700,000.00 to invest in the Vista Studios venture. None of those persons, whom he listed as creditors in his bankruptcy petition, recovered the monies they loaned him.

U.S. Response to Memo. at 4.  The United States also attempts to distinguish this case from the many that Courtney cites in which the sentencing courts imposed a sentence well below the Guidelines range.  See U.S. Response to Memo. at 4.  According to the United States, "in each of these cases, the defendants had pleaded guilty."  U.S. Response to Memo. at 4.  Last, the United States contends that the amount of the loss in this case is so great that a probation-only sentence could never satisfy the § 3553(a) considerations.  See U.S. Response to Memo. at 5.

On the day of the sentencing hearing, Courtney sent the Court a letter explaining his actions.  See Courtney Letter at 1-2.  Courtney states that, although he exercised his right to a jury trial and wishes to preserve his appellate rights, he is deeply sorry for the economic harm he has inflicted upon the victims in this case.  See Courtney Letter at 1.  He expresses a desire to pay them back in full at the earliest possible opportunity and relates to the Court how he feels he went down the path that led him to commit these crimes.  See Courtney Letter at 1-2. Essentially, he tells the Court that he got caught up in a successful, "win-win" pattern of real estate investments that, before his downfall, made both Courtney and those with whom he associated very wealthy.  See Courtney Letter at 1-2.  He expresses gratitude for his loving and supportive family, and asks the Court for a sentence of probation, so that he "can continue to

contribute to [his] community and begin paying for the losses in this case." Courtney Letter at 2. He states that his mother is retired and that his sister is stricken with mental illness, and that he is worried about their ability to cope with him receiving a prison term. See Courtney Letter at 2.

At the sentencing hearing,[6] the parties began by arguing the sophisticated means enhancement. See Transcript of Hearing at 6:18-25:13 (taken October 9, 2013)("Tr.") (Wisenberg, Court, Higgins).[7] Courtney summarized the arguments in his briefing, stating essentially that, if this case's facts triggered the sophisticated means enhancement, it would be hard to imagine a case that does not merit the enhancement. See Tr. at 6:18-10:13 (Wisenberg). In particular, Courtney argues that, because the fraud was committed by way of only two transactions -- the two mortgage agreements -- there is nothing sophisticated about the crime. See Tr. at 7:4-21 (Wisenberg). The United States, on the other hand, asserts that it has cited numerous cases in which the sophisticated means enhancement was applied and in which there were only a few transactions in the fraud; the United States says that the number of transactions in a fraudulent scheme is a poor proxy for the scheme's sophistication. See Tr. at 10:21-11:5 (Higgins, Court). It argues that "the sophisticated means enhancement will apply if the overall scheme was sophisticated, even if the individual acts did not appear to be." Tr. at 11:7-9 (Higgins). The United States says that the mortgages in question were not made hastily, but, rather with great deliberation; it notes Courtney's use of straw buyers and his payment by way of

---

[6]Solomon Wisenberg represented Courtney at the sentencing hearing. See Transcript of Hearing at 1:3-4 (taken October 9, 2013)("Tr.")(the Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final version may contain slightly different page and/or line numbers)(Wisenberg); id. at 1:18-21 (Wisenberg). Courtney's trial attorney, Billy Blackburn, was present at counsel table at sentencing but did not speak at the hearing. See Tr. at 1:18-24 (Wisenberg, Court).

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final version may contain slightly different page and/or line numbers.

cashier's checks.  See Tr. at 11:17-13:2 (Higgins).  Last, the United States pointed out that the letter that Courtney wrote promising to pay the straw buyers' mortgage payments "did not in any way have him admitting to any kind of criminal liability . . . [and] also had no legal effect whatever."  Tr. at 13:23-14:1 (Higgins).  The Court stated that it had reviewed the law regarding the sophisticated means enhancement, and that it was inclined to agree with the United States and apply the enhancement.  See Tr. at 19:4-25:13 (Court).

The parties next discussed the aggravating role enhancement.  See Tr. at 25:18-46:17 (Court, Higgins, Wisenberg).  Courtney argued that the trial "testimony is overwhelming that Jason Johns had the primary leadership role."  Tr. at 25:21-22 (Wisenberg).  He asserted that Johns was the one who approached Rhonda Smith, one of the straw buyers, to recruit her as an unwitting participant and that Johns had signed both loan applications.  See Tr. at 25:22-26:11 (Wisenberg).  He states that Johns had testified at trial that Courtney was "not on the real estate side" and "not involved in any finances."  Tr. at 27:12-15 (Wisenberg).  Courtney further asserts that Johns put roughly $100,000.00 of his in-laws' money into the scheme and that Johns was an investor in the company himself.  See Tr. at 27:16-28:4 (Wisenberg).  Last, Courtney noted that the original PSR had not assigned Courtney any role adjustment.  See Tr. at 36:16-37:8 (Wisenberg).  The Court checked with the USPO about that omission, which had been rectified before the issuance of the amended PSR even without the United States objecting, and the USPO stated that it had been an oversight stemming from an early misreading of the facts in the case.  See Tr. at 38:4-17 (Probation Officer).  The USPO also stated that it was not recommending that the Court give Johns a role adjustment, either aggravating or mitigating, at his sentencing.  See Tr. at 38:14-22 (Probation Officer, Court).

The United States rebutted Courtney's arguments with three of its own. First, it said, "Johns had no ownership interest" in the business; he was an independent contractor, and he "worked under Mr. Courtney." Tr. at 32:15-19 (Higgins). Second, the United States stated that Courtney was "the de facto manager of Black Diamond," and that Courtney was the one responsible for building the houses and obtaining the construction loans. Tr. at 32:2-33:6 (Higgins). Third, the United States argued that the most important factor was that Johns did everything he did "on behalf of Mr. Courtney" -- "Johns didn't own these houses," nor did he "have the authority or the permission . . . to sell the houses. Only Mr. Courtney did." Tr. at 33:7-14 (Higgins). The United States conceded that Johns did much of the "scut work," but that this fact has no bearing on the determination that Courtney is the leader of the two men. Tr. at 34:1-2 (Higgins). Last, the United States notes that Johns never had possession of any funds, and that all loans and sales proceeds went into Courtney's bank accounts. See Tr. at 34:13-22 (Higgins). The United States concluded that Johns was "more of a messenger boy for Mr. Courtney" and that, while the crime could have been committed without Johns, "none of this would work unless Mr. Courtney was completely involved." Tr. at 35:10-24 (Higgins).

The Court stated that it was inclined to apply the aggravating role enhancement under U.S.S.G. § 3B1.1(c), noting that the enhancement is appropriate when the defendant "leads or organizes even one participant." Tr. at 43:14 (Court). The Court noted that "no control is necessary" to qualify for the enhancement under subsection (c), and that devising the scheme, alone, even without hierarchal control, is sufficient to warrant the enhancement. Tr. at 44:6-19 (Court). The Court stated that, by devising the scheme and acting as the straw buyers' point of contact, Courtney exercised decision-making authority and participated in planning and organizing the offense. See Tr. at 44:20-45:12 (Court).

The Court next quickly disposed of the special-skills enhancement, with the United States agreeing that it cannot be imposed on top of an aggravating role enhancement.  See Tr. at 46:11-18 (Court, Higgins).  The parties next addressed the acceptance-of-responsibility reduction, with the parties standing by their briefing on the issue.  See Tr. at 47:23-52:4 (Court, Higgins, Wisenberg).  The Court stated that it would not apply the reduction, noting that Courtney had not acknowledged the criminality of his actions and that "acceptance of responsibility adjustments after trial are very rare."  Tr. at 49:22-24 (Court).

The Court confirmed with the parties that, given its inclinations on the objections, Courtney's Guidelines offense level is 25, see Tr. at 64:12-18 (Court, Wisenberg), and then addressed Courtney's arguments for a variance, see Tr. at 64:19-107:6 (Court, Wisenberg, Higgins).  Courtney indicated an intent to stand on his briefing, and the Court asked a few questions about the NCIA Report that Courtney was largely unable to answer.  See Tr. at 65:2-67:21 (Court, Wisenberg).  Courtney clarified, however, the difference between the two reports, which is that the second report included defendants who received § 5K1.1 departures for substantially assisting the United States.  See Tr. at 65:15-24 (Court, Wisenberg).  Courtney also talked about how he had been brought up in an "anything goes" real-estate environment, Tr. at 69:6 (Wisenberg), how he was remorseful for his actions, how these actions were atypical of Courtney's character, and how -- although he may be undeserving of an acceptance-of-responsibility reduction -- he took mitigating actions to avoid more harm being done to the victims, see Tr. at 68:16-71:6 (Wisenberg).

Courtney personally addressed the Court and expressed contrition before the imposition of sentence.  See Tr. at 75:6-79:7 (Courtney, Court).  The Court asked Courtney about Landmark Worldwide, and Courtney described it as follows:

[T]hey're a company that has offices around the world, and they provide courses and coaching for people, whether they're personal or professional, to fulfill in what matters to them, what's important to them in life. And I volunteered for them, as you've read, for a while. And then I worked for them, and then I continue to volunteer for them. There are two different aspects. And then after the indictment, the indictment, I left a salaried position to volunteer. So there is a large body of people who do volunteer for the company, supporting the mission and the reason for their existence. And --

THE COURT: What is its mission?

THE DEFENDANT: Its mission is to empower and enable people in fulfilling what matters to them, what's important to them, and in the process, leave them with more power, freedom, self-expression, peace of mind. And I've taken that on as my own mission as well. And I've found many of those people are honestly very close to me, whether I've had one conversation with them or many. And I would have had many more people write letters except for confidentiality of their participants in some form or fashion.

But Landmark is one way I found that I can get back into the community. It started when I was very young, when I first took one of their programs, and I didn't actually realize then, it was later that I realized the difference of having power in life in whatever I deal with. And I'm very grateful for the training I've received from them in dealing with this matter, as I'm able to, you know, bring courage and strength to what I'm dealing with, and honor my word.

Those are some -- I mentioned integrity and honor in my word, because that's one of the key principles we operate with.

Tr. at 77:21-79:7 (Courtney, Court).

The Court outlined a number of factors that apply downward and upward pressure on the sentence, which it will explain in greater detail below. See Tr. at 94:18-105:6 (Court). The Court decided to vary Courtney's sentence downward by eight offense levels, to a working offense level of 17, which indicates a sentencing range of 24-30 months. See Tr. at 104:25-105:4 (Court). The Court imposed a sentence of 24-months imprisonment and three-years supervised release -- on both counts, with both to run concurrently -- with the following mandatory and special conditions:

The defendant shall not possess a firearm, ammunition, destructive device, or any dangerous weapon.

. . . .

The defendant shall cooperate in the collection of DNA, as directed by statute.

The defendant must submit to a search of his person, property, or automobile under his control, to be conducted in a reasonable manner, reasonable time, for the purposes of detecting any evidence of fraudulent conduct or illegal contraband, at the direction of the probation officer.   He must inform any residents that the premises may be subject to a search.  This special condition is imposed to help the probation office monitor the defendant's compliance on supervision.

The defendant will be prohibited from incurring new credit charges, opening additional lines of credit, or negotiating or consummating any financial contracts without prior approval of the probation officer.   This condition is imposed based on the large amount of restitution that is owed in this case.

The defendant must provide the probation officer access to any requested financial information, personal income tax returns, authorization for release of credit information, and other business financial information in which the defendant has a control or interest.  This condition is imposed based on the large amount of restitution that is owed in this case.

The defendant shall have no contact with the co-defendant in this case. And this condition is imposed based upon this federal offense which involved the co-defendant, Jason Johns.

Finally, the defendant is restricted from engaging in an occupation where he engages or has access to real estate transactions involving mortgage loan processing or lending services without prior approval of the probation officer. This condition is imposed based upon this federal offense which involved the defendant using his skills and knowledge as a real estate broker to secure fraudulent mortgage loans.

Pursuant to the Mandatory Victim Restitution Act, it is further ordered that the defendant will make restitution to Aurora Bank FSB, in the amount of $493,230.88.  The restitution will be paid in monthly installments of 15 percent of the defendant's gross monthly income, or 150, whichever is greater.  Restitution amount shall be paid jointly and severally with co-defendant Jason Johns, and shall be sent to Aurora FSB, Care of Helen M. Vicente, Vice President, 10350 Park Meadows Drive, Littleton, Colorado, 80124.   Re: line should be "Keith Michael Courtney Matter."

Based on the defendant's lack of financial resources, the Court will not impose a fine.  Defendant shall pay a special assessment of $100 as to each count of conviction, for a total of $300, which is due immediately.

Tr. at 107:13-109:24 (Court).  The parties did not object to the mandatory or special conditions.

See Tr. at 109:25-110:14 (Court, Higgins, Wisenberg).

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so

> as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006). This presumption, however, is an appellate presumption and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory guideline sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. 1(H). In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

(1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)  solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)  all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)  any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.).

Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)[8]("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury

---

[8]United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Schmidt, United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), and United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration

of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C.

- 27 -

§ 3661.  See United States v. Watts, 519 U.S. at 151.   According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).   In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan,

918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  See 11 F.3d at 1515.  The defendant argued "that because the additional

drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515.   Although the Tenth Circuit in <u>United States v. Washington</u> "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 84 (1986)).[9]   <u>See</u> <u>United States v. Sangiovanni</u>, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); <u>United States v. Cervantes-Chavez</u>, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing

---

[9]Although the Tenth Circuit stated in <u>United States v. Washington</u> that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," <u>United States v. Ray</u>, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting <u>United States v. Olsen</u>, 519 F.3d 1096, 1105 (10th Cir. 2008)).   <u>See</u> <u>United States v. Olsen</u>, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting <u>United States v. Washington</u>, 11 F.3d at 1516)).   The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.   <u>United States v. Olsen</u>, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); <u>United States v. Constantine</u>, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level by 4 levels); <u>United States v. Valdez</u>, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

## LAW REGARDING U.S.S.G. § 3B1.1'S AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Section 3B1.1 of the Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a)     If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b)     If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

(c)     If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. 1.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. 4.  The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'"  United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).   "[A] defendant's participation in illegal but lower-level activities," however, "will not support application of the enhancement."  United States v. Sallis, 533 F.3d at 1223.   Nevertheless, "[a] defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant."  United States v. Damato, 672 F.3d 832, 847 (10th Cir. 1992).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive].'"  United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)).  See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons.  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.").  "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1 cmt. 3.  "The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1, background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct.  "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction.  To qualify as an organizer, however, no control is necessary."  United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)).  The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants."  United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997).  Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'"  United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (10th Cir. 1995)).

In addition to the aggravating role enhancements provided in subsections (a), (b), and (c), § 3B1.1 also sets forth a closely related departure provision.  Application note 2 to § 3B1.1 provides:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1 cmt. 2.  The second sentence contemplates increases to a defendant's sentence even if the defendant did not lead, manage, supervise, or organize any other single participant,

provided he exercised managerial responsibility in the criminal organization.  This provision, however, sets forth conditions for a departure -- not an adjustment, like the rest of § 3B1.1 -- and, thus, to apply, the defendant's level of managerial authority must be outside the heartland of cases that the substantive guideline contemplates.  See United States v. Cervantes-Chavez, 2014 WL 6065657, at *23-28.  In United States v. Cervantes-Chavez, the Court considered whether to depart on managerial-authority grounds where a defendant was discovered hiding 175 pounds of marijuana and $19,625.00 in cash at his house -- almost certainly a drug organizations "property[ and] assets."  U.S.S.G. § 3B1.1 cmt. 2.  See United States v. Cervantes-Chavez, 2014 WL 6065657, at *2.  The Court declined to apply an aggravating role enhancement, because -- although the defendant appeared to be a middle-man in the drug trade based on the amount of drugs he was holding -- the United States could not point to any individual over which the defendant had leadership or managerial control; the defendant was the only member of the drug organization that the United States could find.  See 2014 WL 6065657, at *22.  The Court also declined to depart on the managerial-responsibility grounds outlined in the second sentence of § 3B1.1 comment 2, concluding that, although the defendant exercised some managerial responsibility over a drug organization's assets, the defendant had already been sentenced under the guideline for possessing 80-100 kilograms of marijuana with intent to sell it, and the defendant's level of managerial responsibility did not fall outside the heartland of cases that the substantive-offense guideline contemplated.  See 2014 WL 6065657, at *28.  The Court found most offenders guilty of possessing that quantity of marijuana have some level of managerial responsibility over a drug organization's assets -- it is unlikely that a individual unaffiliated with a drug organization would come into possession of that much marijuana -- and thus the case was

not "outside the heartland of cases that § 2D1.1(c)(8) [the guidelines for possessing 80-100 kilograms of marijuana] contemplates." 2014 WL 6065657, at *28.

### LAW REGARDING THE USE OF "SOPHISTICATED MEANS" TO COMMIT FRAUD

U.S.S.G. § 2B1.1(b)(10)(C) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels. If the resulting offense is less than level 12, increase to level 12." U.S.S.G. § 2B1.1(b)(10)(C). Application note 9 provides, "[f]or the purposes of subsection (b)(10)(c), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. 9(B).

"The possession of false document-making implements may constitute sophisticated means, as may creation of numerous false documents, even if the documents were easily generated and contained only simple falsehoods." Guidelines Handbook §27, at 390. The Tenth Circuit first addressed the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[10] In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld." 52 F.3d at 845. The district court applied the sophisticated means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case." 52 F.3d at 849. The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized

---

[10]The Sentencing Guidelines' enhancement for the use of sophisticated means in the commission of offenses falling under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1. Compare U.S.S.G § 2B1.1, cmt. 8(B), with U.S.S.G. § 2T1.1, cmt. 4.

deductions than actually paid." 52 F.3d at 849.  In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric."  52 F.3d at 849.  In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit found that the district court's application of the sophisticated means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts.  See 199 F.3d at 1158.  The defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, not herself, which are harder to trace, by only depositing a small fraction of her embezzled funds in a bank, which made her embezzlement difficult for the IRS to investigate, and by never withdrawing more than $10,000.00 in one day, which demonstrated that she knew that depositing any more would require the bank to notify the IRS of the deposit, and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

The Tenth Circuit has upheld the application of a sophisticated means enhancement to a defendant who conducted seminars on avoiding tax liability, and "assisted in the preparation of tax returns that were false and fraudulent as to a material matter."  United States v. Ambort, 405 F.3d 1109, 1113 (10th Cir. 2005).  In United States v. Ambort, the Tenth Circuit found that there was ample evidence in the record to support a sophisticated means enhancement, because the defendant's program was designed to provide a basis that someone could later articulate why

- 36 -

they were entitled to the tax status they advanced and included discussions about what information should not be included in tax forms to avoid traceability.  See 405 F.3d at 1120.

In United States v. Snow, 663 F.3d 1156 (10th Cir. 2011), the Tenth Circuit held that a district court properly applied an enhancement for the use of sophisticated means under U.S.S.G. § 2B1.1, where the defendant "did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions."  663 F.3d at 1163.  The Tenth Circuit determined that the defendant's fraudulent scheme was complex, because of the lengths which the defendant took to execute the fraud, and also because the defendant successfully deceived numerous financial institutions and title companies, indicating that he necessarily used sophisticated mean to "fool trained and experienced bank and closing personnel."  663 F.3d at 1163.  That the defendant provided, and directed others to provide, fraudulent documentation and information sufficient to deceive the personnel reviewing it, procured and instructed others to procure cashiers' checks to disguise the true source of his income, and circulated and instructed others to circulate funds through different bank accounts to avoid detection indicated that he used sophisticated means. See 663 F.3d at 1163.  With these facts, the Tenth Circuit determined that the district court properly applied a sophisticated means enhancement to the defendant's sentence under U.S.S.G § 2B1.1.  Similarly, in United States v. Tilga, the Court found that an enhancement for the defendant's use of sophisticated means was warranted where the defendant used offshore accounts and shell companies to evade taxes by hiding the amount of money she earned.  See 824 F. Supp. 2d at 1330-34.  The Court explained that the commentary to the sentencing guidelines regarding the use of sophisticated means recognizes that the enhancement applies

because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner."  824 F. Supp. 2d at 1330-31. Moreover, the Court explained that the case law addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement."  824 F. Supp. 2d at 1332.

Additionally, the United States Court of Appeals for the Sixth Circuit has upheld the imposition of a sophisticated means enhancement where the defendant created and used fictitious trusts to hide assets from the Internal Revenue Service, even though the defendant was not a sophisticated businessman and no offshore trusts were involved.  See United States v. Schwartz, 408 F. App'x 868, 870 (6th Cir. 2010)(unpublished).  The United States Court of Appeals for the Seventh Circuit, in United States v. Minneman, 143 F.3d 274 (7th Cir. 1998), held that the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income.  See 143 F.3d at 1283.

## LAW REGARDING ACCEPTANCE OF RESPONSIBILITY

A defendant is entitled to a 2-level reduction in his offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1(a).  Upon the United States' motion, a defendant may be entitled to an additional 1-level reduction if the United States asserts that the defendant has assisted authorities in its investigation or prosecution "by timely notifying the authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."  U.S.S.G. § 3E1.1(b).  The reduction for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of

proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits

guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. 2.

1.    In determining whether a defendant qualifies [for an acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a)], appropriate considerations include, but are not limited to, the following:

(A)    truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

(B)    voluntary termination or withdrawal from criminal conduct or associations;

(C)    voluntary payment of restitution prior to adjudication of guilt;

(D)    voluntary surrender to authorities promptly after commission of the offense;

(E)    voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(F)    voluntary resignation from the office or position held during the commission of the offense;

(G)    post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(H)    the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

U.S.S.G. § 3E1.1 cmt. 1.

A defendant who exercises his right to trial and is convicted is not automatically precluded from receiving an acceptance-of-responsibility adjustment. See U.S.S.G. § 3E1.1 cmt. 2; United States v. Wooten, 377 F.3d 1134, 1146 (10th Cir. 2004). When a defendant goes to trial to litigate and preserve issues not related to factual guilt, such as the constitutionality of a criminal statute or the applicability of a particular statute to the defendant's conduct, he may still be eligible for an adjustment based on his pre-trial conduct and statements. See United States v. Salazar-Samaniega, 361 F.3d 1271, 1280-81 (10th Cir. 2004). "The Application Notes clearly indicate that a guilty plea alone may not be enough to qualify for a reduction, and that the absence of a guilty plea will not bar a reduction." United States v. Collins, 511 F.3d 1276, 1281 (10th Cir. 2008). Nevertheless, the Tenth Circuit has explained that, although possible, "[o]ur cases make . . . clear that acceptance of responsibility adjustments after trial are very rare." United States v. Sims, 428 F.3d 945, 961 (10th Cir. 2005).

A district court's decision to deny an adjustment for acceptance of responsibility to a defendant is reviewed for clear error. See United States v. Sarracino, 340 F.3d 1148, 1173 (10th Cir. 2003). The Guidelines recognize that the sentencing court "is in a unique position to evaluate a defendant's acceptance of responsibility," and, therefore, the district court's determination that a defendant is not entitled to an adjustment for acceptance of responsibility "is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. 5. See United States v. Loza, 184 F. App'x 772, 775 (10th Cir. 2006)("We give 'great deference' to the district court's determination whether a defendant accepted responsibility.").

"While it is certainly possible for a defendant to accept responsibility and go to trial, these circumstances are rare." United States v. Foghorn, No. CR 03-2365 JB, 2007 WL 1302649, at *2-3 (D.N.M. Feb. 21, 2007)(Browning, J.). The Court has found that a defendant

who "conceded all material facts, but . . . his defense at trial was that his actions did not cause the death of [the victim]," was not entitled to a reduction for his acceptance of responsibility.  United States v. Foghorn, 2007 WL 1302649, at *4.  The defendant in United States v. Foghorn was convicted of second-degree murder and kidnaping.  See 2007 WL 1302649, at *2.  Regarding his conviction for kidnaping, Foghorn, at trial, "admitted many of his actions regarding seizing and moving [the victim], [but] he argued at trial that he . . . did not kidnap [the victim] for an improper purpose."  2007 WL 1302649, at *5.  Because Foghorn asserted that the United States had failed to establish beyond a reasonable doubt that he had kidnapped the victim for some purpose or benefit, and thus required the United States to prove his factual guilt at trial, the Court found that he was not entitled to a reduction for his acceptance of responsibility regarding the kidnaping charge.  See 2007 WL 1302649, at *5.

    With respect to his conviction for second-degree murder, Foghorn did not "contest the United States' facts regarding the brutal treatment of [the victim] at his hands," but contested whether his actions resulted in the death of the victim.  2007 WL 1302649, at *5.  The Court found that Foghorn's testimony at trial was not "sufficiently comprehensive to cover all the elements of the crimes with which he was charged."  2007 WL 1302649, at *6.  Further, Foghorn's admission came late in the prosecutorial process, and Foghorn continued to assert that his actions did not cause the victim's death -- a "factual element that the United States must establish to convict a defendant for murder."  2007 WL 1302649, at 6.  Foghorn continued to assert, through post-trial motions, that his actions did not cause the victim's death.  The Court found that Foghorn's actions "required the United States to prove his factual guilt and refused to take full responsibility for the offense of which he was convicted," and was thus not entitled to a reduction in his offense level for acceptance of responsibility.  2007 WL 1302649, at *6.

The Tenth Circuit has found that a district court did not clearly err by denying a defendant a reduction for acceptance of responsibility, where the defendant pled not guilty to charges, even though the defendant confessed pretrial and did not attempt to retract his confession.  See United States v. Portillo-Valenzuela, 20 F.3d 393, 394 (10th Cir. 1994).  The Tenth Circuit noted that the defendant, Portillo-Valenzuela, had formally pled not guilty, and thereby, "forced the government to prove his factual guilt at trial."  20 F. 3d at 394 ("Portillo-Valenzuela's plea and insistence on trial 'brought into question whether he manifested a true remorse for his criminal conduct.'"  (quoting United States v. Ochoa-Fabian, 935 F.2d 1139, 1143 (10th Cir. 1991))).  The Tenth Circuit, in making its decision, looked to precedent from the United States Court of Appeals for the Eighth Circuit, in United States v. Davila, 964 F.2d 778, 784 (8th Cir. 1992), where the Eighth Circuit upheld a district court's denial of the reduction, because the defendant had pled not guilty on all counts, and thus forced the government to prove his guilt, even though the defendant confessed pretrial and offered to cooperate.  See 20 F.3d at 394.

The Tenth Circuit explained that the question to answer, when determining whether to grant a defendant a reduction for his or her acceptance of responsibility after the defendant has proceeded to trial, "is not whether he actively asserted his innocence, but whether he 'clearly demonstrate[d]' acceptance of his guilt."  United States v. Portillo-Valenzuela, 20 F.3d at 394, (quoting U.S.S.G. § 3E1.1(a)).  "Pleading not guilty and requiring the government to prove guilt at trial demonstrate denial of responsibility, regardless of how easily the government can prove guilt."  20 F.3d at 394-95.  The Tenth Circuit noted that U.S.S.G. § 3E.1.1 cmt. 2 does not preclude a defendant who proceeds to trial from receiving the reduction, but also noted that a defendant's choice to plea not guilty is a factor which may be considered in determining whether

he or she accepted responsibility.  See 20 F.3d at 395 (stating that application note 2 "does not suggest that in some or all cases the court may not consider whether the defendant pleaded not guilty and went to trial").  The Tenth Circuit determined that denying Portillo-Valenzuela the reduction was thus not clear error, because he pled not guilty and proceeded to trial, regardless of the weight of evidence presented against Portillo-Valenzuela.  See 20 F.3d at 395 ("We therefore do not need to consider the extent of the government's evidence at trial.").

The Tenth Circuit upheld a district court's grant of a reduction for acceptance of responsibility in United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999).  In that case, the Tenth Circuit found that a district court did not err in granting the reduction where the defendant, Gauvin, "admitted all of the conduct with which he was charged [and] . . . simply disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension" 173 F.3d at 806.  Gauvin was convicted, by a jury, on charges of assault with a dangerous weapon and assault on a federal officer.  See 173 F.3d at 801.  Gauvin's argument at trial was based on his theory that "he did not intend, while drunk and scared, to cause injury to others."  173 F.3d at 806.  Gauvin also "contended that his drunkenness rendered him incapable of forming the requisite mens rea."  173 F. ed at 806.  The district court stated, in granting the reduction, that Gauvin was "entitled to pursue the theory that he did all these things on which the charges were based, but the one thing he didn't do is try to use his car to hurt the officers."  173 F.3d at 806 (internal alterations omitted).  The Tenth Circuit found that Gauvin's defense was essentially an argument that the statute under which he was charged did not apply to his conduct. The Tenth Circuit stated that its affirmance of the district court's decision rested "in part on the fact that Mr. Gauvin went to trial only to contest the legal element of intent."  173 F.3d at 806. On the other hand, the Tenth Circuit reiterated that the reduction for acceptance of responsibility

after trial should only be given in rare circumstances, and the Tenth Circuit stated that it "might not have reached the same decision" had it decided whether to grant Gauvin the reduction. 173 F.3d at 806. Nevertheless, "in light of the deference afforded the sentencing judge," the Tenth Circuit found that the district court did not err in granting Gauvin a reduction for acceptance of responsibility. 173 F.3d at 806.

The Tenth Circuit has since limited its holding in United States v. Gauvin by clarifying the court's rationale in upholding the reduction. In United States v. Collins, the Tenth Circuit noted that a defendant was correct in stating that "Gauvin stands for the proposition that a defendant's admission of guilt at trial up to the point of the asserted defense can earn the offense level reduction," but also noted that United States v. Gauvin "does not establish that the district court must grant an offense level reduction under these circumstances." 511 F.3d at 1280 (emphasis in original)(internal citations omitted). The Tenth Circuit qualified its decision in United States v. Gauvin by pointing out that "on appeal, the government had to establish that the district court committed clear error in granting the adjustment . . . . And we must always bear in mind that 'the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility' and is entitled to 'great deference on review.'" United States v. Collins, 511 F.3d at 1281 (quoting United States v. Hamilton, 413 F.3d 1138, 1145 (10th Cir. 2005))(alterations omitted).

The Tenth Circuit has recently discussed the limitation of United States v. Gauvin's holding:

> As a threshold matter, in Gauvin, we merely accorded the district court the requisite deference in upholding its decision to grant the two-level reduction. We did not indicate that other sentencing courts would be obliged to reach the same conclusion on similar facts. In other words, giving other sentencing courts the same degree of deference, we might well uphold their decisions on similar facts to deny the acceptance-of-responsibility adjustment. . . . Indeed, we emphasized in

- 44 -

Gauvin that we ourselves "might not have reached the same decision" as the district court.

United States v. McGehee, 672 F.3d 860, 877 (10th Cir. 2012)(quoting United States v. Gauvin, 173 F.3d at 806). The Tenth Circuit further explained: "[I]n Gauvin, we emphasized that the defendant had 'admitted to all the conduct with which he was charged' . . . we stated that his argument was essentially a challenge to the applicability of the statute in question to his conduct." United States v. McGehee, 672 F.3d at 878. Similarly, the Tenth Circuit has emphasized that, in United States v. Gauvin, Gauvin went to trial to dispute whether his acknowledged factual state of mind, while "drunk and scared," made him culpable of the charged offense -- assault -- which requires an "intent to harm or cause apprehension." United States v. Salazar-Samaniega, 361 F.3d 1271, 1280-81 (10th Cir. 2004).

In United States v. McGehee, the Tenth Circuit noted that the defendant, McGehee, "did not admit to all of the conduct in the indictment, and he did not seek only to preserve issues that do not relate to factual guilt." 672 F.3d at 878 (internal citation omitted). The Tenth Circuit determined that McGehee did not accept responsibility, even though he "presumably create[ed] a somewhat easier path for the government in terms of evidence presentation by his several stipulations," because he stipulated to a laboratory test of narcotics found on him and his prior felony conviction in relation to his charges for possession with an intent to distribute cocaine, and the use of a firearm during the commission of a drug-trafficking crime. 672 F.3d at 864-65, 878. Nonetheless, because McGehee did not admit his guilt to two of the three Counts charged in an indictment, and because McGehee moved for acquittal on all three counts after the United States presented its evidence at trial, the Tenth Circuit found that United States v. Gauvin was factually distinguishably and its precedent did not apply to McGehee's appeal. See 672 F.3d at 878. The Tenth Circuit also stated that, had McGehee "fully admitted his guilt as to Counts One

- 45 -

and Three at trial," the determination to grant a reduction for acceptance of responsibility would have been based upon his pretrial statements and conduct.  672 F.3d at 878 (citing United States v. Hutchinson, 573 F.3d 1011, 1032 (10th Cir. 2009); United States v. Eaton, 260 F.3d 1232, 1237 (10th Cir. 2001))(internal quotation marks omitted).  "Simply put, an admission of guilt at trial does not suffice to mandate an award of the acceptance-of-responsibility reduction."  United States v. McGehee, 672 F.3d at 878.  In conclusion, the Tenth Circuit noted that, because

> Mr. McGehee went to trial, did not stipulate to all of the factual elements of any count of conviction, and indeed held the government to its ultimate burden on each count . . . we conclude with no difficulty that the court did not err in denying Mr. McGehee an offense-level reduction for acceptance of responsibility.

672 F.3d at 878.  Thus, a defendant who goes "to trial not to preserve a legal issue but to test the government's evidence" is not entitled to a reduction for his or her acceptance of responsibility. United States v. Allen, 129 F.3d 1159, 1167 (10th Cir. 1997).  See United States v. Manzanares-Sanabria, 814 F. Supp. 2d 1155, 1170-74 (D.N.M. July 14, 2011)(Browning, J.)(declining to grant an acceptance-of-responsibility reduction where the defendant pleaded guilty on the morning of trial).

### LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing guideline ranges are now advisory[11] and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to

---

[11]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guidelines ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory.");  United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline

range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

        The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

        The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

United States v. Valdez, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. at 50-51, the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence that the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. at 351 ("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).   Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the United States Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

In Kimbrough v. United States, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  552 U.S. at 89 (quoting Rita v. United

- 48 -

States, 551 U.S. at 350).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States so as to be able to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and thus, no variance from the guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

The Court will apply enhancements for aggravating role and use of sophisticated means, decline to apply an enhancement for use of a special skill, and decline to apply a reduction for acceptance of responsibility.  These conclusions result in a total offense level of 25, which, when matched with Courtney's criminal history category of I, indicate a Guidelines sentencing range of 57-71 months.  The Court will vary downward, however, and sentence Courtney to a 24-month term of imprisonment.

## I.    THE  COURT  WILL  APPLY  A  2-LEVEL  ENHANCEMENT  FOR AGGRAVATING ROLE UNDER U.S.S.G. § 3B1.1(c).

The Court will accept the USPO's recommendation and the United States' argument that it apply a 2-level enhancement for being "an organizer, leader, manager, or supervisor in any criminal activity."  U.S.S.G. § 3B1.1(c).  Unlike subsections (a) and (b), an aggravating role

enhancement under subsection (c) requires no minimum number of criminal participants -- control over a single criminal collaborator will do. Here, Courtney exercised control over Johns. See PSR ¶ 48, at 15; id. ¶¶ 5-31, at 4-12. By developing the scheme and acting as the straw purchasers' point of contact, Courtney exercised decision-making authority, and participated in planning and organizing the offense. Courtney owned a fifty-percent interest in all three companies, while Johns was merely a contractor of one. Further, Courtney recruited accomplices by convincing the straw purchasers to participate in the transaction. These factors demonstrate that Courtney was an organizer of criminal activity within the meaning of § 3B1.1(c).

Triggering an enhancement under subsection (c) is not an especially high bar. In addition to there being no minimum size for the criminal enterprise, the enhancement is not limited to "organizer[s] and leader[s]," but, rather, applies to "manager[s]" and "supervisor[s]," as well. U.S.S.G. § 3B1.1(a), (c). "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)). The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "'[t]he key to determining whether a

defendant qualifies as an organizer is not direct control but relative responsibility.'"   United

States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112

(10th Cir. 1995)).

> The Court must consider
>
> [(i)] exercise of decision making authority, the nature of participation in the commission of the offense, [(ii)] the recruitment of accomplices, [(iii)] the claimed right to a larger share of the fruits of the crime, [(iv)] the degree of participation in planning or organizing the offense, [(v)] the nature and scope of the illegal activity, and [(vi)] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. 4.  Analyzing the first factor, Courtney was, by all appearances, both the

initiator and the final word when it came to decision-making.  On the second factor, Courtney

recruited Johns to join his criminal scheme.  Additionally, Courtney is ultimately responsible for

recruiting the straw buyers and his mother into his scheme, exposing them to substantial risk --

both financial risk and risk of criminal prosecution.  The straw buyers and the mother might not

be "participants" under § 3B1.1, because they may not be individually criminally culpable for

their actions, but recruiting them was nonetheless an act of organization or management.  As to

the third factor, Courtney, as the business owner, reaped a far greater potential reward from the

scheme than Johns did; the two men would not equally share any profits from the scheme.

Fourth, as mentioned in regard to the first factor, Courtney appeared to be the primary planner

and decision-maker in this scheme.  Fifth, although this scheme technically involved only two

criminal participants, it involved several other unknowing participants, and it bilked the victims

out of almost a million dollars.  Sixth, it is difficult to ascertain how much control Courtney

exercised over Johns, but this factor is only necessary for the leadership or organizer

enhancements, not the manager or supervisor enhancements.

It is true, as Courtney argues, that Johns was involved in many facets of the scheme, including, for example, his own efforts to recruit the straw purchasers. The Guidelines make clear, however, that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, cmt. 4. That Johns may have been eligible for the organizer role enhancement does not mean that Courtney is ineligible for the enhancement. Regardless, the USPO did not recommend and the Court did not impose an aggravating role enhancement onto Johns, and thus the point is moot. See Tr. at 38:14-22 (Probation Officer, Court). The Court will apply a 2-level aggravating role enhancement to Courtney's sentence.

## II.   THE COURT WILL NOT APPLY AN ENHANCEMENT FOR USE OF A SPECIAL SKILL UNDER U.S.S.G. § 3B1.3.

The Court cannot apply a special-skill enhancement in conjunction with an aggravating role enhancement, and the Guidelines suggest that, if both enhancements factually apply, the Court should apply the aggravating role enhancement and not the special-skills enhancement.

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3 (emphasis added). The United States concurs with the Court's conclusion. See Tr. at 46:11-18 (Court, Higgins). The Court will thus apply the aggravating role enhancement but not the special-skill enhancement.[12]

---

[12]The Court notes, however, that Johns received the special-skill enhancement, and, for the same reasons that it applied to Johns, the enhancement is factually applicable to Courtney.

## III.    THE COURT WILL APPLY A 2-LEVEL ENHANCEMENT FOR USE OF SOPHISTICATED MEANS UNDER U.S.S.G. § 2B1.1(b)(10).

The Court concludes that Courtney's conduct warrants a 2-level sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  Courtney argues that the means by which he carried out his scheme were less sophisticated than those in other select cases in which courts have imposed the enhancement.  Although that may be true, that the means Courtney used to carry out this scheme are less sophisticated than some does not mean that they are unsophisticated.  As the United States maintains:

> [Courtney's] overall scheme involved using [his] companies to obtain appraisals in excess of the underlying construction loans, enlisting straw buyers to sign the loan applications, obtaining no-documentation loans allegedly for the purchase of primary residences, concealing that the associated costs paid to the title companies came from Courtney, all in order to divert the sales proceeds to Courtney's benefit.  Courtney's subsequent payment of the mortgages extended the concealment of the fraud.  These actions are sufficient for the application of the enhancement for use of sophisticated means.

U.S. Response to Objections at 8.   The Court agrees, and will, therefore, impose the sophisticated means enhancement.  The Guidelines commentary describes the enhancement as follows:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 3B1.1 cmt. 9(b).  Courtney specifically sought no-documentation loans to minimize the front-end scrutiny to which his scheme would be subjected, used "blind" straw buyers to

---

See Presentence Investigation Report of Jason Johns ¶ 50, at 15, disclosed May 17, 2013 (noting that Johns "used his special skills as a loan officer in a manner that significantly facilitated the commission and concealment of the offense").

effectuate the fraudulent transactions, and paid their mortgage payments with cashier's checks to conceal the source of the payments and thus avoid arousing suspicion. These means are sophisticated in the ordinary use of the word, and it is by no means the case that all mortgage fraud cases would trigger the enhancement under this rationale. See United States v. Rice, 52 F.3d at 849 (holding that a tax-evasion scheme was not sophisticated, because, under the district court's rationale, "every fraudulent tax return will fall within that enhancement's rubric").

Courtney's use of cashier's checks is similar to the defendant's fraud in United States v. Guidry, whose scheme was sophisticated, because she solicited payment made out to a bank, rather than to herself, in small amounts, and never withdrew more than $10,000.00 in one day. See 199 F.3d at 1158. Just as Guidry's behavior involved the sophisticated use of otherwise common banking tools -- checks made payable to a bank and ordinary bank withdrawals -- Courtney used his specialized knowledge to obtain the mortgage he needed to minimize his risk of detection and employed cashier's checks for their relative difficulty to trace. The Court will apply the 2-level sophisticated means enhancement.

## IV.  THE COURT WILL NOT APPLY A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY UNDER U.S.S.G. § 3E1.1.

The Court concludes that Courtney's conduct does not warrant a 2-level acceptance-of-responsibility reduction under U.S.S.G. § 3E1.1(a). A defendant is not automatically precluded from receiving an acceptance-of-responsibility reduction when he or she goes to trial, but the Tenth Circuit has held that such "adjustments after trial are very rare." United States v. Sims, 428 F.3d at 961. Section 3E1.1's commentary sets forth the circumstances in which a post-trial reduction might be appropriate:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.

Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).  In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 cmt. 2.

According to Courtney, he is entitled to the acceptance-of-responsibility reduction for two basic reasons: first, he "deeply regrets, and has always deeply regretted, any losses or hardships caused by his actions"; and, second, he never argued that he executed the transactions "perfectly, or even appropriately in all respects . . . .  [He] has simply denied that he intentionally schemed to defraud."  Keith Michael Courtney's Objections and Comments to the Presentence Report at 5, filed October 2, 2013 (Doc. 151-1).  With respect to the first argument, the Court does not believe that Courtney's expression of regret for the consequences of his actions clearly demonstrates that he has accepted responsibility for the criminality of his actions.  Courtney's second argument amounts to an assertion of his factual innocence, i.e., that he lacked the requisite mens rea to be properly convicted -- an argument that the jury rejected.  This argument is not the sort of legal challenge to a statute that U.S.S.G. § 3E1.1 cmt. 2 contemplates.  The Court will not, therefore, apply an acceptance-of-responsibility reduction.

## V.    THE COURT WILL VARY FROM THE GUIDELINES SENTENCING RANGE AND IMPOSE A 24-MONTH SENTENCE.

Courtney's total offense level under the Guidelines is 25, his criminal history category is I, and his sentencing range, therefore, is 57-71 months.  The Court will, however, vary from the Guidelines range to fashion a sentence that is sufficient, but not greater than necessary, to comply with the [following] purposes":

     **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     **(B)**     to afford adequate deterrence to criminal conduct;

     **(C)**     to protect the public from further crimes of the defendant; and

     **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a)(2).  In tailoring a sentence to meet these ends, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

The Court has identified twelve factors that put downward pressure on Courtney's sentence, and four factors that put upward pressure on it.  First, the Court has read the numerous letters sent to it on Courtney's behalf and considered Courtney's volunteer work, and it concludes that Courtney is a man of generally decent character and integrity.  Second, the temporal spacing between the two criminal transactions suggests to the Court that these criminal incidents represent aberrant behavior in Courtney's life -- not the extent of warranting a departure, because they involved planning, but enough to apply downward pressure on the sentence.  Third, the Court concludes that Courtney can be an asset to the community if rehabilitated -- he is intelligent, entrepreneurial, of generally high character, and has special skills -- and the Court concludes that Courtney needs less correctional imprisonment than the average defendant.  Fourth, and related to the third, the public also needs less protection from Courtney than it needs from someone the Court is convinced might recidivate.

Fifth, Courtney's youth and his inexperience in his professional field at least partially contributed to this crime.  A similar ethical lapse is less likely to occur again and that it occurred this time is more excusable for someone in Courtney's position than it would be for someone

with decades of experience in the field.  Sixth, the Court has read the Courtney Letter, and -- although the Court has concluded that Courtney does not merit an acceptance-of-responsibility reduction -- the Court concludes that Courtney is genuinely remorseful for his actions and the impact they have had on the victims in this case.  Courtney's remorse is probably more genuine than many defendants who received the reduction, and this remorse puts downward pressure on the sentence.   Seventh, Courtney is a first-time offender, and was, before this crime, an upstanding member of the community with a strong, budding business reputation.   This conviction, thus, inflicts a punishment on Courtney that it might not inflict even on other first-time offenders, let alone recidivists.   Courtney's standing in his business and professional community has been deleteriously impacted -- every letter the Court received reflects an individual who knows of Courtney's convictions, and there are likely many others who did not write to the Court.  That Courtney has already been seriously reputationally punished reduces the need for the Court to impose further punishment and puts downward pressure on the sentence. Eighth, for the reasons already stated, the Court believes that Courtney's chances of rehabilitation are very strong, and his odds of recidivism relatively low.  The Court is thus almost entirely concerned with imposing punishment and deterrence, rather than incapacitating Courtney to protect the public.

Ninth, after reviewing the NCIA Report in detail, the Court concludes that most similar defendants sentenced for similar crimes are sentenced to terms of imprisonment well below the 57-71 months the Guidelines now indicate.  See NCIA Report at 6 & n.2 (indicating an average sentence of 26.1 months when probation-only sentences are excluded and a sentence of 24.4 months when probation-only sentences are counted as a zero-month sentence).  Although these sentences were individually tailored for the defendants to whom they were given, and, thus, the

Court will not mirror them in this case, it does appear that sentencing Courtney within the Guidelines would be inconsistent with what other courts are doing.   Tenth, the Court is particularly swayed by the similarities between this case and its own previous case, United States v. Ward, No. CR 10-2318 JB, 2011 WL 3503273 (D.N.M. Aug. 5, 2011)(Browning, J.), in which the defendant was sentenced to 21-months imprisonment for using his special skills as an attorney to defraud a victim out of $500,000.00.   See 2011 WL 3503273, at *1.   That case was resolved via a plea agreement, the defendant accepted responsibility, and the loss amount was lower than in this case.   See 2011 WL 3503273, at *1-2.   Nonetheless, the similarities are striking, and the inconsistencies that would result if the Court were to sentence Courtney within his Guidelines sentence put downward pressure on the sentence.   Eleventh, this crime is not nearly as serious as many that the Court sees; fraud is a nonviolent property crime, and the scope of damages here is limited to two intuitional lenders.   Although this crime is still undoubtedly serious, the limited number of victims and scope of damages put downward pressure on the sentence.   Last, the need for specific deterrence in this case is low, because, as the Court has already concluded, Courtney's risk of recidivism is low.

Four factors also put upward pressure on the sentence, although they do not outweigh the downward-pressure factors.   First, this case was perceived as serious within the community: it garnered press attention, and the public deserves to see justice done, and a sentence imposed that is proportional to the crime.   Second, this activity, in the aggregate, imposes substantial costs on society.   Lenders cannot rely as freely on no-documentation loans, knowing that they must protect themselves against fraud and thus self-impose administrative costs to protect themselves from people like Courtney.   These costs are then passed on to everyone.   Third, Courtney's recruitment of possibly unwitting participants -- the straw buyers and his mother -- into his

criminal scheme put others outside of his criminal enterprise at financial and legal risk.  This behavior was at the very least reckless and puts upward pressure on the sentence.  Last, crimes like this one are difficult to detect with speed or certainty, and, thus, punishment must be stepped up to effectuate general deterrence.  Courtney argues that increased sentencing does little to deter crime, but harsher sentencing is all there is to deter crimes like this one.  Furthermore, offenders who commit crimes like this one are more sophisticated than most criminal defendants and thus more likely to be aware of the magnitude of their potential criminal exposure.  The Court assumes -- and it must make this assumption under § 3553(a)(2)(B)'s general-deterrence consideration -- that harsher sentencing will, at least to some extent, result in fewer new offenders committing a crime.[13]

---

[13]The Court distinguishes general deterrence -- the effect that a sentence has on deterring people other than the defendant from committing the crime -- from specific deterrence -- the effect that the sentence has on deterring the defendant from recidivating.  The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- either has no significant correlation to recidivism or increases the defendant's likelihood to recidivate.  See, e.g., Lin Song & Roxanne Lieb, Recidivism: The Effect of Incarceration and Length of Time Served 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), available at http://wsipp. wa.gov/ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, The Effect of Time Served on Recidivism: An Interdisciplinary Theory, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism).  This trend obtains even for white-collar criminals.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).  Thus, specific deterrence is a suspect ground for increasing incarceration, except insofar as the offender

will be prevented -- though not "deterred" in the usual sense -- from committing additional crimes <u>while in custody</u> for the longer time period. This concept, however, is distinct; it is referred to as incapacitation, and academics do not usually consider it to be a subcategory of specific deterrence. Professor Daniel Nagin explains:

> The distinction between incapacitation and deterrence is also important for policy. Crime prevention by incapacitation necessarily requires higher imprisonment rates and the attendant social costs. By contrast, if crime can be deterred from occurring in the first place, there is no perpetrator to punish. As a consequence, crime prevention by deterrence does not necessarily involve a trade-off between crime rates and imprisonment rates.

Daniel S. Nagin, <u>Deterrence: A Review of the Evidence by a Criminologist for Economics</u>, 2013 Annual Rev. Econ. 5:83, 84. Both specific deterrence and incapacitation are, of course, valid considerations in sentencing, and the difference between the two may be more important to academics than to courts. Courts are bound to impose sentences consistent with 18 U.S.C. § 3553(a), and both considerations -- specific deterrence and incapacitation -- are reflected in the same two § 3553(a) factors: (a)(2)(B)'s mandate "to afford adequate deterrence to criminal conduct" and (a)(2)(C)'s mandate "to protect the public from further crimes of the defendant." The Court concludes that specific deterrence is embodied more by (a)(2)(B) than (a)(2)(C), while incapacitation is embodied more by (a)(2)(C) than (a)(2)(B), but both statutory provisions support both considerations, and if Congress did not care to separate them, the Court must address them both when sentencing a defendant. Thus, the Court must still consider specific deterrence when sentencing, because Congress demands it; prevailing research simply indicates that alternatives to incarceration are generally more effective on this front.

There is, however, comparatively more support for incarceration's general-deterrence value. An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the crime ($f$, for "fruits") outweighs the product of the likelihood of getting caught and brought to justice ($c$, for "certainty") multiplied by the detrimental impact of the punishment on the individual ($s$, for "severity"). If $f > c \cdot s$, the individual will commit the crime, and if $f < c \cdot s$, the individual will not commit the crime. The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established. For example, $s$ and $f$ would have to be put into the same units. Commonly, $s$, the punishment for a crime, starts out in units of months of incarceration; $f$, the crime's benefit to the criminal, often starts out in units of dollars. A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison. This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, <u>e.g.</u>, an 80-year-old man with millions of dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name. Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- <u>i.e.</u>, for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison. The model would also have to

account for: (i) the possibility of being arrested but not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted.  These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other -- necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \cdot s$.  Analogous issues exist on the left-hand side of the formula -- the expected value of committing the crime.  It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

　　None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable.  The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime.  Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, on average, reflect the rational pursuit of incentives, i.e., individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior.  Thus, under the economic model, all Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.  This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional increase to either has the same effect on the right side of the equation.

　　The model, however, does not work in the real world; it has been falsified by empirical research.  The model is dead, and facts, not theory, killed it.  If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate.  For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime.  Now assume that the certainty was raised -- by way of increased resources devoted to police, investigation, prosecution, etc. -- to 40%.  The number of people who commit the crime would go down from 100 to $x$.  This figure, $x$, is not a predictable number, i.e., it is not necessarily 50, because to determine $x$'s value one would have to know more about $f$, and where $c \cdot s$ stood in relation to it both before and after the certainty modification.  Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10 years to 20 years.  The number of people who commit the crime would again go down from 100 to $x$, and, although $x$ would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

　　An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.  See Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more

important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, <u>The Deterrent Effect of Perceived Severity of Punishment</u>, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, <u>Certainty v. Severity of Punishment</u>, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, <u>The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited</u>, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, <u>Criminal Deterrence Research at the Outset of the Twenty-First Century</u>, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, <u>An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity</u>, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, <u>Estimating the Economic Model of Crime with Individual Data</u>, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., <u>Criminal Deterrence and Sentence Severity: An Analysis of Recent Research</u> 47 (1999); Robert Apel & Daniel S. Nagin, <u>General Deterrence: A Review of Recent Evidence</u>, <u>in</u> <u>Handbook on Crime and Criminal Justice</u> (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, <u>The Deterrent Effect of Legal Sanctions on Draft Evasion</u>, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, <u>Criminal Deterrence: A Review of the Literature</u>, J. Econ. Literature (forthcoming). Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment. It is difficult to pin down the extent to which real-world (empirical) findings deviate from the one-to-one rate predicted by the economic model -- <u>i.e.</u>, whether certainty is twice as important, three times as important, or ten times as important -- as it appears to differ in different contexts. Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment meted out. The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

   It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why." It is even less clear why celerity plays any role in a potential criminal's decision. The

On balance, the Court concludes that these factors impart a net eight offense levels of downward pressure on the sentence.  Courtney's effective offense level is, thus, 17, which indicates a sentencing range of 24-30 months.  The Court will sentence Courtney to the low end of the range, and impose a sentence of 24-months imprisonment.

The Court has carefully considered Courtney's request for a probation-only sentence.  As is implicit in the Court's above analysis, while the mitigating factors push Courtney's sentence down, they do not push it into the no-incarceration range.  The crime is too serious, and the starting Guidelines range is too high, to give Courtney probation.

**IT IS ORDERED** that: (i) the Defendant's Objections to August 28, 2013 Redisclosed Presentence Investigation Report, filed October 2, 2013 (Doc. 151), is sustained in part and

---

Court suspects that the average street-level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive.  From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information.  Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch.  See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013).  It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals.  Thus, general deterrence remains an important consideration in cases like this one, in which the perpetrators are relatively sophisticated and the certainty of detection relatively low -- and the celerity even lower.

Those in the community who know Courtney might be less apt to commit mortgage fraud themselves when they see Courtney sentenced to prison rather than probation.  That they were more deterred by seeing Courtney's crimes detected and punished in the first place does not change this conclusion.  Moreover, a proper sentence reflects more than just specific- and general-deterrence considerations.  This sentence may deter no one, and Courtney may be on the straight and narrow from here on out regardless of the sentence that the Court imposes, but the Court's sentence must still "provide just punishment for the offense" and comply with the factors enumerated in § 3553(a).  18 U.S.C. § 3553(a)(2)(1).

overruled in part; (ii) the requests in the Sentencing Memorandum of Keith Michael Courtney, filed October 3, 2013 (Doc. 152), are granted in part and denied in part; (iii) the requests in the Letter from Keith Michael Courtney to the Court, filed October 9, 2013 (Doc. 156), are granted in part and denied in part; and (iv) Defendant Keith Michael Courtney is sentenced to a term of 24-months imprisonment and three-years supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
    United States Attorney
Mary L. Higgins
Stephen R. Kotz
Fred J. Federici III
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Billy R. Blackburn
Paul Linnenburger
Albuquerque, New Mexico

--and--

Adrienne Wisenberg
Barnes & Thornburg LLP
Washington, D.C.

--and--

Solomon Wisenberg
Nelson Mullins Riley & Scarborough LLP
Washington, D.C.

    *Attorneys for the Defendant*

- 64 -